The **FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, as Receiver for Knox Federal Savings & Loan Association, Plaintiff,**

v.

**J. Garrett BURDETTE, Clayton Christenberry, Jr., Alex Curtis, Estate of Howell C. Curtis, Steve Curtis, William H. Curtis, Michael M. Downing, Estate of John J. Duncan, John J. Duncan, Jr., Joe S. Duncan, Ralph H. Newman, Jr., William Regas, C.A. Ridge, Richard G. Rutherford, Estate of Burton B. Simcox, and Estate of David M. Stair, Defendants.**

**J. Garrett BURDETTE, et al., Third–Party Plaintiffs,**

v.

**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Third–Party Defendant.**

**Civ. A. No. 3–87–809.**

United States District Court, E.D. Tennessee, N.D.

June 22, 1989.

650

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge, Sitting by Designation.

### PART I

In this case the Federal Savings & Loan Insurance Corporation (FSLIC), as receiver for Knox Federal Savings & Loan Association (Knox), filed suit against former officers and directors of Knox. The FSLIC and the directors and officers brought third-party claims against American Casualty Company of Reading, Pennsylvania (ACC), claiming that an officers' and directors' policy of insurance, for which ACC was responsible, covered the acts of the officers and directors in the principal suit. The matter in this part involves numerous motions to dismiss, strike affirmative defenses, and for summary judgment, filed by the FSLIC, ACC, and several of the third-party plaintiff officers and directors.[1] These motions all address the third-party complaints filed in this case against ACC, and ACC's answers and counter-claims to these third-party actions; therefore, the court will consider them together. The parties have fully briefed the issues, and oral argument has been heard. The four major issues raised in these motions will be discussed separately below.

#### 1. Notice

■ The directors' and officers' insurance policy at issue is a claims made policy, under which the insurer agrees to assume liability for acts or omissions of the type

---

1. The motions at issue in this order are the motion by ACC for summary judgment as to notice and single loss issues, the motion by the FSLIC for summary judgment as to notice and single loss issues, motions by all third-party plaintiff officers and directors, except for Joe Duncan and Michael Downing, for summary judgment as to notice, misrepresentation, single loss, and advancement of defense cost issues.

In addition, a motion to dismiss the misrepresentation defense of ACC by third-party plaintiffs Burdette, Alex Curtis, Steve Curtis, Regas, Ridge, Rutherford, Simcox, and Estate of David Stair, is at issue in this order, as is the motion by the FSLIC to strike or for partial summary judgment as to the misrepresentation defense of ACC.

covered by the policy regardless of when they occurred, if (1) the claim arising out of the act or omission was made during the policy period, or (2) notice was given to the insurer within the policy period as to an occurrence which may subsequently give rise to a claim.[2] Specifically, § 6(A) of the policy provides:

> If during the policy period the Association or the Directors of Officers shall ... become aware of any occurrence which may subsequently give rise to a claim being made against the Directors and Officers ... for a Wrongful act; and shall, during such period, give written notice thereof to the Insurer as soon as practicable and prior to the date of termination of the policy, then any claim which may subsequently be made against the Directors and Officers arising out of such Wrongful Act shall, for the purpose of this policy, be treated as a claim made during the policy year in which such notice was given.

In this case, no claims were made within the policy period. The FSLIC and the directors and officers assert that ACC was given notice during the policy period of possible claims against the officers and directors. Two letters were sent to ACC's predecessor in interest, MGIC Indemnity Corporation, during the policy period which the FSLIC and the former officers and directors contend constitute proper notice under the policy.[3]

The first letter was written by Richard Alexander, then president of Knox, on December 22, 1983, which stated in pertinent part as follows:

> I am hereby notifying you that it is the intention of this Association to file suit against certain former officers and directors of Knox Federal Savings and Loan Association. The cause of action would be the result of the actions and negligence of the directors and their failures to properly supervise the actions of

the officers and employees of the Association. The events occurred after September 7, 1982.

On January 10, 1984, MGIC responded to the letter stating that the policy had been sold to ACC, and that an ACC representative would follow up shortly. On January 19, 1984, Mr. Snyder from ACC wrote to Alexander, acknowledging receipt of the December 22, 1983, letter, and indicated that until an action was commenced against a Knox official, no affirmative action on ACC's part was necessary. The response also added that a claim file had been opened, and that ACC wished to be advised of all developments relating to the matter. The record does not indicate that any further correspondence related to the Alexander letter occurred until after the FSLIC filed the instant lawsuit.

The second letter was written by David Stair, a member of the Knox board of directors, on February 27, 1984, which stated as follows:

> As a director of the captioned corporation covered by the captioned policy, I am advised that without my knowledge or participation a substantial number of loans were made by the corporation which may create a potential liability against me.

> While no claims as yet have been asserted, the purpose of this letter is to give you notice of this potential in accordance with Section 6(A)(ii) of said policy.

ACC responded on April 16, 1984, stating that if nothing more was heard within sixty days, it would be assumed that no claims were filed, and ACC would close its files. ACC sent another letter on July 27, 1984, stating that ACC was closing its files as no further information was provided by Stair.

■ The FSLIC and the officers and directors argue that the two above-mentioned letters substantially complied with

---

**2.** This is compared to an occurrence policy, which covers acts or omissions occurring during the policy period regardless of when the subsequent claim is filed. A Windt, *Insurance Claims and Disputes* § 1.07, at 20–21, n. 67 (2d ed.1988).

**3.** MGIC wrote the policy at issue, but on November 1, 1983, MGIC and CNA Insurance Companies (of which ACC is a part) entered into an agreement whereby CNA purchased this policy and others like it.

the notice provision in the policy and, therefore, constitute proper notice under the policy. In addition, they contend that ACC has waived any objections to waiver, as ACC never objected to the letters when they were received, or ever informed Knox that these notice letters were not sufficient or that certain additional information was necessary. ACC argues that these letters were not sufficient under the policy, as the § 6(A) notice provision should be narrowly construed, and there has been no evidence provided that connects the Alexander or Stair letters to any of the specific claims made by the FSLIC in its action against the former Knox officials.[4] ACC also contends that even if these letters are sufficient by their own terms they limit notice to claims against certain officers and directors and only for events occurring after September 7, 1982.

Summary judgment should be granted when the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *McKee v. Cutter Laboratories, Inc.,* 866 F.2d 219, 220 (6th Cir.1989). All inferences drawn from the facts must be viewed in a light most favorable to the non-moving party, *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *Roland v. Johnson,* 856 F.2d 764, 769 (6th Cir.1988), and there is no genuine issue unless there is sufficient evidence favoring the non-movant for a jury to return a verdict for that party (if the evidence is merely colorable, or is not significantly probative, summary judgment may still be granted). *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *McKee,* 866 F.3d at 220. The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion, there must be no genuine issue of *material* fact, *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10; *Berlin v. Michigan Bell Telephone Co.,* 858 F.2d 1154, 1161 (6th Cir. 1988), and the burden on the moving party may be discharged by pointing out that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Cale v. Johnson,* 861 F.2d 943, 949 (6th Cir.1988).

The record is without dispute that MGIC was notified on December 22, 1983, that a claim would be made against "certain former officers and directors." This language is sufficiently broad to cover one or all former officers and directors, and MGIC and ACC had notice at that time of forthcoming claims against one, some, or all former officers and directors. The response by MGIC and ACC did not in any way question the sufficiency of the notice nor did the companies attempt to obtain any more specific information relating to the identification of the officers and directors to be sued. If notice provided to an insurer is considered by the insurer to be defective, good faith requires the insurer to notify the insured of its objections within a reasonable time, and if the insurer fails to do so or proceeds to act as though notice was satisfactory, it has waived any right to assert notice as a defense at a later date. *Crumley v. Travelers Indemnity Co.,* 225 Tenn. 667, 475 S.W.2d 654, 658 (1972); *Pennsylvania Ins. Co. v. Horner,* 198 Tenn. 445, 281 S.W.2d 44, 46 (1955); *Johnson v. Scottish Union Ins. Co.,* 160 Tenn. 152, 22 S.W.2d 362, 363 (1929). Examining the letters that passed between Knox and

---

4. ACC also argues that these letters present no notice whatsoever as to potential claims Aetna Casualty & Surety Company may have against former Knox officials, therefore, there can be no coverage for the third-party claims asserted against eight former Knox officials by Aetna in *FSLIC v. Aetna,* (E.D.Tenn.). However, any recovery Aetna may obtain against these former Knox officials will be via subrogation due to Aetna having to pay out under its fidelity bond to the FSLIC, and consequently Aetna will step into the FSLIC's shoes and will be able to assert whatever claims the FSLIC could against these former Knox officials. *FSLIC v. Aetna Casualty & Surety Co.,* 696 F.Supp. 1190, 1192–93 (E.D. Tenn.1988). Since the FSLIC as receiver stands in Knox's shoes, if this notice is sufficient as to Knox, it is sufficient as to the FSLIC and, hence, it is sufficient as to Aetna.

ACC, there is an absence of any attempt by ACC to inform Alexander or Stair that their letters were not considered proper notice under the policy, or that additional information would be necessary in order for proper notice to be given. Indeed, the responses ACC provided indicated that ACC thought notice was proper, as claim files were opened and ACC stated that it would await the commencement of formal litigation against the officers and directors before it would take any further action. This is action consistent with the appearance that ACC believed notice was appropriate and that whenever a claim was filed, it would act as if the claim was filed within the policy period pursuant to § 6(A) of the policy, relating to notice being given within the time of the policy period. It is not in the interests of fairness or justice to permit an insurer to remain silent at the time purported notice is received, and then much later, after claims have been filed which may subject the insurer to some liability under the policy, permit the insurer to complain for the first time that notice was not sufficient.[5]

■ Concluding that ACC is precluded from arguing that Alexander and Stair letters provide insufficient notice for those events described in those letters, does not resolve the notice issue entirely, as it still must be determined what events are set out in those letters. Notification as to one loss or claim does not constitute notifica-tion as to another, *James J. Brogger & Assoc. v. American Motorists Ins. Co.*, 42 Colo.App. 464, 595 P.2d 1063, 1065 (1979), and it would certainly turn the notice provision in this policy into a nullity to permit notice as to the action of one director on a certain date to constitute notice as to another director's unrelated action on a different date. As to the Stair letter, this determination is not difficult, as the letter deals only with claims made against Stair for alleged acts or omissions committed by Stair. Therefore, the Stair letter provides notice to ACC for all claims filed against Stair by the FSLIC.

■ The Alexander letter contains a specific statement as to the first date of events which are the subject of Knox's claims. The Alexander letter clearly gives notice as to events which occurred after September 7, 1982. Consequently, there will no notice difficulties as to any FSLIC claim that refers to events that occurred at Knox after September 7, 1982. However, as to claims related to pre-September 7, 1982, events, ACC will not be responsible for any coverage, as no notice was provided to it of these events during the policy period.

■ With respect to which Knox officials are covered by the Alexander letter, it clearly states that Knox intends to sue "certain former officers and directors" of Knox. At the time of the letter, four of the current third-party plaintiff officers

---

5. ACC's two arguments against waiver are not persuasive. First, ACC argues that it cannot be held to have waived notice defenses because it was not aware of the deficiencies in notice until much later when the FSLIC claims were filed and ACC determined that the FSLIC's claims and the events in the Alexander and Stair letters did not necessarily match up. If this position was accepted, ACC could never be held to waive objections to notice, as it could always be argued that until a case is filed, an insurer will never know whether notice corresponds to claims subsequently made. This would leave insureds never knowing until some point down the road whether they are covered by an insurance policy for claims that may be made against them, and this is not consistent with principles of justice and fair-dealing in the insurance context. Moreover, since there is no indication that ACC ever conducted any investigations upon receipt of these letters, ACC is hardly in the position to argue that it could not have detected deficiencies in notice until a later date.

Second, ACC argues that under § 6(E) of the policy, Knox must furnish copies of all reports, investigations, and pleadings connected with the events described in the notice letter. ACC contends that Knox did not provide any additional information to ACC, therefore, the FSLIC should not be able to benefit from its failure to provide ACC with necessary information by arguing waiver. However, the fact that Knox may or may not have provided ACC with further information as it became available does not absolve ACC from conducting a preliminary investigation when notice is received and promptly informing an insured as to real or potential problems with purported notice. There is certainly nothing in the language of the policy, or § 6(E) in particular, that would support ACC's position.

and directors, Joe Duncan, John J. Duncan, Sr., Burton Simcox, and David Stair, were still officers and directors of Knox, therefore, their purported misconduct is not covered by the Alexander letter. Since notice was not provided to ACC during the policy period concerning actions by Joe S. Duncan, John J. Duncan, Sr., and Burton Simcox (Stair is covered by his own letter to ACC), these three are not covered in any way by the ACC policy.

ACC argues that letters by Alexander to the Federal Home Loan Bank Board (FHLBB) of January 3, 1984, and March 14, 1984, as well as the minutes of the March 9, 1984, Knox board meeting, suggest Knox intended to file suit against only eight former Knox officials. ACC argues that this means that only those named in the letter are the "certain" former officers and directors of Knox referred to in Alexander's December letter, therefore, the Alexander letter constitutes notice under the policy only as to those named.

▮ The court rejects this argument. At this point we are only interested in whether "written notice" was given to the "insurer ... prior to the date of termination of the policy," as required by § 6(A) of the policy. Nothing said at a date after the notice letter can lessen the notice given to and received by the insurer. The letter of December 23, 1983, either gives notice or it does not, and letters to others or minutes of meetings at later times cannot take away notice that has already been given. As indicated earlier, the words "certain former officers and directors" was notice to the insurer that one, some, or all the former officers and directors might be sued. Clearly, in the subsequent letters, Alexander was consulting with his superiors regarding the possibility of suing fewer defendants. The January 3, 1984, letter to the FHLBB states:

> If you desire for Knox Federal not to initiate suit against any of the above

parties, or if you request that Knox Federal sue any of the above Directors against whom I have recommended suit not be initiated at this time, please notify me immediately.

The only reasonable construction of the several letters shows that Alexander notified broadly, continued to consider a more limited suit but finally, as seen by the pleadings in this case, sued broadly.

It is likely that in the December 22, 1983, letter, Alexander believed claims could be made against all former Knox officials, but was uncertain as to what claims the FHLBB wished pursued. As such, the December 22, 1983, letter provided notice as to all former Knox officials, and the subsequent correspondence referred to by ACC simply is evidence of "in-house" discussion by the FHLBB as to which of the many possible defendant officers and directors should be sued. Indeed, the fact that two of the former Knox officials Alexander recommended be sued were never sued, yet several who Alexander suggested not be sued are named as defendants in this case, supports the conclusion that this subsequent correspondence was nothing more than part of an ongoing process of deciding against whom it would be worth bringing suit. As such, this subsequent correspondence has no bearing on the December 22, 1983, notice letter.

Accordingly, the cross-motions for summary judgment on the notice questions are granted in part and denied in part. As to Joe Duncan, John J. Duncan, Sr., and Burton Simcox, their third-party complaint against ACC is dismissed because ACC is not responsible for any insurance coverage due to a lack of notice within the policy period. As to David Stair concerning the notice question *only*, ACC is responsible for coverage as to all acts or omissions committed by Stair. As to the other third-party plaintiff officers and directors and Tackett [6] (concerning the notice question

---

6. The FSLIC has made it clear that in its intervening third-party complaint it does not argue that ACC has coverage on Tackett's actions, and Tackett is not a third-party plaintiff in the directors' and officers' third-party complaint.

However, Tackett has filed a counterclaim to the ACC counterclaim to the third-party complaints (in ACC's counterclaim it named Tackett as an additional counter-defendant), and in it Tackett also contends that he is covered by the

*only*), ACC was not notified within the policy period of any event before September 7, 1982, for which liability may be claimed and, therefore, these directors and officers are not covered by the policy in this case as to pre-September 7, 1982, events, and as to such events, ACC's motion is granted.

### 2. Misrepresentation

The issue of misrepresentation is raised in ACC's answers to the two third-party complaints against it as its twelfth affirmative defense. This defense is based upon alleged misrepresentations contained in the Proposal Form for Directors' and Officers' Liability Insurance which was filled out on behalf of Knox on July 20, 1982, and was signed by Arnold Tackett and William Curtis. While ACC did not specify originally which answers in the Proposal Form it alleged were false, in its response to the motions of the FSLIC and the officers and directors, it has tendered a proposed amended twelfth affirmative defense which alleges that the answers to questions 4(f), 5, and 6, were false.[7] Section 7(A) of the policy specifies what effect misrepresentations will have on policy coverage:

> However, this policy shall not be voided or rescinded and coverage shall not be excluded as a result of any untrue statement in the Proposal Form, except as to those persons making such statement or having knowledge of its untruth.

The FSLIC and the directors and officers argue that ACC's twelfth affirmative defense essentially alleges fraud and that, as such, it must be dismissed as it fails to plead fraud with particularity as required Fed.R.Civ.P. 9(b). They also argue that the twelfth affirmative defense should be dismissed via summary judgment, as there is no genuine issue of material fact that no misrepresentation occurred, and that the only two former Knox officials that could be effected by any alleged misrepresentations would be Arnold Tackett and William Curtis, as they are the only two who signed the Proposal Form.[8] ACC responds that it has now sufficiently pled its misrepresentation defense, and that there is still a genuine issue of fact as to whether there are any misrepresentations in the Proposal Form. Finally, ACC argues that there is also a genuine issue of fact as to whether other Knox officials who did not sign the Proposal Form knew of the alleged untruths in it.

The FSLIC and officers and directors contend that ACC's misrepresentation defense does not contain sufficient facts concerning exactly what answers in the Proposal Form are alleged to be false. Because ACC has submitted a proposed twelfth affirmative defense in its responsive brief providing the additional information needed, the court will require nothing further. *See Fischer v. New York Stock Exchange*, 408 F.Supp. 745, 756 (S.D.N.Y. 1976).

With respect to the question of whether misrepresentations exist in the Proposal

---

ACC policy. Therefore, even though Tackett has not filed any motions for summary judgment on the notice question, Tackett is covered by the ACC policy.

**7.** Question 4(f) reads as follows:

Are there any negotiations now pending for the sale of stock in this Bank in excess of 10% of the total stock outstanding?

Question 5 asks whether Knox has "been involved in any actual or proposed merger, acquisition or divestment in the last 5 years," and Question 6 asks whether any regulatory agency has "denied or indicated that they would deny any contemplated merger, acquisition or divestment in the last 5 years."

**8.** The FSLIC also argues that ACC's misrepresentation defense is barred by the federal common law doctrine articulated in *D'Oench, Duhme &*

*Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The court has recently addressed this same argument by the FSLIC in *FSLIC v. Aetna Casualty & Surety Co.*, No. 3–88–132, slip op. at 4–8 (E.D.Tenn. May 30, 1989). In that decision, the court concluded that pursuant to controlling Sixth Circuit precedent, *FDIC v. Turner*, 869 F.2d 270, 276 (6th Cir.1989), a misrepresentation defense may only be precluded by the *D'Oench* doctrine if the party asserting that defense was involved in, knew of, or contributed to the alleged scheme to deceive the FSLIC/FHLBB of which the alleged misrepresentation was a part. Just as in *Aetna,* here ACC is not alleged to have had any part in any alleged misrepresentations in the Proposal Form, nor is it alleged to have known about these misrepresentations. Consequently, *D'Oench* does not preclude ACC's misrepresentation defenses.

Form, the court agrees with ACC that based on the evidence provided thus far, there is still a genuine issue of fact which precludes summary judgment. There was very little evidence produced on this question in the motions filed by the FSLIC and the offices and directors, presumably because until ACC filed its response it was not known what questions in the Proposal Form were alleged to be false. Consequently, while summary judgment on this specific question is not appropriate at this time, the parties are not foreclosed from filing appropriate dispositive motions in the future if accompanied by supporting documentation.

■ Finally, as to the question as to which officers and directors will be effected by any misrepresentations that do exist in the Proposal Form, § 7(A) of the policy controls. Most recently this exact same provision was examined by the Fourth Circuit, which concluded that § 7(A) operates exactly as it reads; therefore, if an officer or director did not sign the Proposal Form or did not know of the misrepresentations in it, coverage could not be barred as to them. *Atlantic Permanent Fed. Sav. & Loan Ass'n v. American Casualty Co. of Reading, Pennsylvania,* 839 F.2d 212, 215 (4th Cir.1988), *cert. denied,* — U.S. —, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). Here, only Tackett and William Curtis signed the Proposal Form, therefore, those two will be denied coverage under the policy if misrepresentations are found to have existed. As to any other officer or director, evidence has been provided by the FSLIC that certain officers and directors had no knowledge of the contents of the Proposal Form, therefore, coverage could not be barred as to them by operation of § 7(A). While ACC has not provided any evidence at this time, it has represented to the court that such evidence indicating that others knew of alleged untruths in the Proposal Form exists. Based on what the ACC has represented to the court, the court will give ACC and the FSLIC or officers and directors until July 12, 1989, to submit such evidence that bears on this issue. As to those officers and directors for which ACC fails to produce evidence

indicating knowledge of untruths contained in the Proposal Form, summary judgment will be entered for those officers and directors on the misrepresentation issue. If ACC provides no additional evidence whatsoever, only Tackett and William Curtis will be subject to possible misrepresentations in the Proposal Form. Until this additional information is received, the court will defer any decision on this particular aspect of these pending motions.

Accordingly, the motions to dismiss the misrepresentation defense of ACC are denied. The motions for summary judgment as to the misrepresentation defense are also denied, but only concerning whether misrepresentations indeed exist in the Proposal Form. As to which officers and directors will be precluded from coverage if misrepresentations do exist, the court reserves judgment until additional evidence is received.

### 3. Single Loss

Section 4(A) of the policy provides that ACC will pay 100% of a loss up to the limits of liability stated in §§ 4(B) and (C) of the policy. Under §§ 4(B), 4(C), and Item 3 of the Declarations for the policy, the limit of liability for a single loss is $1,000,000, and the aggregate limit of liability each policy year for each officer and director is also $1,000,000. A "loss" is defined in § 1(D) of the policy as any amount the directors and officers are legally obligated to pay for claims made against them for wrongful acts, defined in § 1(E) of the policy as acts or omissions by the officers and directors. Additional guidance is provided in § 4(D) of the policy, where it is provided that multiple acts can lead to a single loss and, hence, only $1,000,000 in coverage:

> Claims based on or arising out of the same act, interrelated acts, or one or more series of similar acts, of one or more of the Directors or Officers shall be considered a single Loss and the Insurer's liability shall be limited to the limit of liability stated in Clause 4(B) and 4(C).

■ The parties have had a full opportunity to discover facts related to the question as to whether or not the twenty-

five loans and loan participations in the *Burdette* complaint constitute a single loss, and from the facts presented to the court in the many motions on this issue the following factual conclusions are without conflict. First, there loans and participations were made on varying dates, ranging from January of 1981 to January of 1983. Second, these loans and participations did not arise out of a single loan program (i.e.: home improvement loans, commercial development loans, etc.) but instead were for a broad range of purposes, including developing condominiums, financing a Florida resort development, remodeling a shopping center, developing office buildings, and developing a computer center. Third, each loan involved different collateral of different types, including a deed on undeveloped land, letters of credit, personal guarantees, GNMA securities, and liens on personal property. Fourth, as to each loan there are alleged different deficiencies in the approval of the loan, including a failure to review the borrowers' current financial statement before approving the loan, relying on an appraiser's report of collateral value when the appraiser was not approved by the board, failing to perfect an interest in collateral pledged, and approving the loan before a signed application by the borrower was received. Fifth, as to each loan there are alleged separate negligent acts by specified directors and officers, ranging from an alleged failure to properly carry out duties as a member of a loan committee by improperly reviewing loan applications,

failure to properly carry out duties as a member of the board of directors by the same alleged failure to inquire, and a breach of the duty of care as a director by failing to even attend board meetings where these loans were discussed. Finally, the loans were to different borrowers, though there is credible evidence to the effect that all the loans or participations either directly or indirectly benefited C.H. Butcher or his associates, and that many were made at Butcher's request.[9]

ACC argues that all twenty-five loans and loan participations arose out of the same sequence of events, alleging that Butcher instructed Tackett to have these loans made and the other directors and officers did nothing to supervise Tackett. ACC concludes that as a result, these twenty-five loans and participations represent a single continuing failure by the officers and directors to carry out their duties due to a single scheme carried out by Butcher and Tackett, therefore, there is only a single loss. The FSLIC and the directors and officers argue that there are twenty-five losses under the policy, as each loan involved separate and distinct exercises (or lack thereof) of judgment and, at the very least, § 4(D) of the policy is ambiguous, and therefore must be construed in the insured's favor.[10]

Four court decisions specifically address the single loss issue now before the court. The first is *Okada v. MGIC Indemnity Corp.*, 608 F.Supp. 383 (D.Hawaii 1985);

---

**9.** The court is not holding that the issues of whether the borrowers for each of these loans are all connected with Butcher, or of whether Butcher dominated Knox and controlled the loan approval process, are now resolved as a matter of law. These are questions for the jury to resolve at trial. All the court does here is to infer for the purposes of these motions that the borrowers are connected to Butcher, and that Butcher exercised significant influence in the loan process.

**10.** The FSLIC and the officers and directors also refer to a contrary position taken on this issue by ACC in the *Atlantic Permanent* case, and apparently assert a judicial estoppel argument, contending that ACC is barred from now arguing for a single loss when in a prior case it argued for a multiple loss analysis. This argument is not persuasive for several reasons.

First, judicial estoppel is only applicable if the party against whom it is asserted was successful in the earlier case, as absent prior judicial acceptance of the contrary position the application of the doctrine is unwarranted because no risk of inconsistent results exists. *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598–99 (6th Cir.1982); *City of Kingsport v. Steel & Roof Structure, Inc.*, 500 F.2d 617, 620 (6th Cir.1974). Because ACC lost in *Atlantic Permanent,* judicial estoppel is not appropriate here. Second, this doctrine applies where there has been a prior misstatement of fact, and not to a situation such as the instant case where ACC simply asserted a contrary interpretation of the policy in the prior case. *See FDIC v. Butcher,* 660 F.Supp. 1274, 1283 (E.D.Tenn.1987); *FDIC v. Berry,* 659 F.Supp. 1475, 1486 (E.D.Tenn.1987).

*aff'd in part rev'd in part,* 795 F.2d 1450 (9th Cir.1986), *modified,* 823 F.2d 276 (9th Cir.1987). That case involved the same policy language as that at issue here. The alleged acts were as follows: voting at separate times to authorize spot loans to home buyers, authorizing five unrelated large condominium project loans, and ordering the move and renovation of corporate headquarters without having sufficient funds. The court held that one overall result can result from several distinct acts, each of which constitutes a separate loss under the policy. *Okada,* 608 F.Supp. at 388. In that case, the court concluded that the loss was not the collapse of the bank, rather the collapse of the bank was caused by one or more separate losses over time. *Okada,* 608 F.Supp. at 388. The court found that each loan was a loss caused by distinct and dissimilar business decisions by the officers and directors of the bank. *Okada,* 608 F.Supp. at 388.

The second is *North River Ins. Co. v. Huff,* 628 F.Supp. 1129 (D.Kan.1985). That case involved similar but not identical policy language, as in that case the coverage was per occurrence as opposed to per loss, but the provision for multiple acts constituting a single occurrence was the same as the provision in this case that multiple acts can constitute a single loss. This case involved six loans, four of which were financed by a method known as the "loan swap" program. The insurer argued there was only one occurrence as to these four loans as each was part of the same program. The court, citing in part *Okada,* held that each loan occurred at different times, involved different borrowers, were for different purposes, and had separate collateral for each. The court concluded that, as a result, these loans were not interrelated, therefore, each was a separate occurrence. *Huff,* 628 F.Supp. at 1133.

The third is *Atlantic Permanent Fed. Sav. & Loan Ass'n v. American Casualty Co. of Reading, Pennsylvania,* 839 F.2d 212 (4th Cir.1988), *cert. denied,* —— U.S. ——, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). This case involves the same policy language defining a loss as found in the instant policy at § 4(D). In that case, nine plaintiffs each asserted seven causes of action arising out of the carrying out of a home improvement loan program. Judgment had already been entered against defendants, and ACC now wanted to apply the $10,000 deductible per loss such that either there were sixty-three separate losses and a $630,000 deductible, or there were at least nine losses and a $90,000 deductible. In that case, the ACC took the position contrary to what it has taken here, that there were separate losses. The district court concluded that these loans were all related to the same loan program, therefore, there was only one loss and one deductible. The appellate court affirmed, concluding that the district court did not abuse its discretion in finding only one loss. *Atlantic Permanent,* 839 F.2d at 219–20. The court was primarily motivated by the fact that ambiguities should be resolved in favor of the insured, and because the policy language concerning multiple acts constituting a single loss was ambiguous, it would be construed for the insured who in that case wanted a finding of a single loss as the deductible would thus be smaller. *Atlantic Permanent,* 839 F.2d at 220.

The final case is *Eureka Fed. Sav. & Loan Ass'n v. American Casualty Co. of Reading, Pennsylvania,* 873 F.2d 229 (9th Cir.1989). This case involves the exact same policy language as is at issue in the instant case. There, the bank adopted an aggressive lending policy in 1983 to reverse chronic operating losses, and after federal deregulation of savings and loans moved into new lending areas such as commercial leasing, commercial industrial real estate, and second marketing of loans. The bank developed a comprehensive management plan, and some two hundred loans related to this plan occurred. It was agreed for summary judgment purposes that a common plan connecting these two hundred loans could be established. The alleged breaches of duty by bank officials involved several different acts, and the court held that simply because all the loans resulted from a single overall loan policy, this did not mean that there was only a single loss under the policy. It was concluded that

there were numerous intervening business decisions that took place after the loan policy was initiated requiring the exercise of independent business judgment, therefore, the decision to implement the loan policy did not cause the losses but, rather, the cause was negligence in making or approving different loans. The court stated that it did not foreclose the possibility that several loans to several borrowers could be aggregated as a single loss in an appropriate fact situation.

Analyzing the facts presented to the court in light of these four decisions, the court concludes that the twenty-five loans and loan participations at issue constitute twenty-five separate losses. This case falls under *Okada, Huff,* and *Eureka,* and as with those cases there are multiple losses here. As in *Huff,* each loan or participation involved separate and different collateral, each loan or participation occurred at a different time, and each loan or participation was for a different purpose. As in *Okada* and *Eureka,* there were different deficiencies with each loan and participation, and as to each there are alleged to have been separate acts or omissions by certain officers and directors which constitute distinct and dissimilar business decisions by the officers and directors of Knox. ACC's major argument, that all twenty-five loans and participations are tied together by a common thread (an alleged Butcher scheme and resulting control of Knox) was rejected in *Eureka,* and is also rejected here. Even assuming that ACC is correct that Butcher (1) dominated Knox, (2) instructed Tackett to issue all of these loans, and (3) either he or his associates benefited from these loans, this does not lead to the finding of a single loss. Numerous independent business decisions were made by individual officers and directors after this alleged scheme began concerning the approval of certain loans or participations, and as was concluded in *Eureka,* even in the face of a "common plan," a finding of multiple losses is appropriate in such a situation.[11]

Accordingly, as to the single loss issue, ACC's motion for summary judgment is denied, and the motions for summary judgment by the FSLIC and the officers and directors are granted. There are multiple losses as a matter of law in this case, therefore under the applicable policy language, ACC's liability for coverage can be as high as $1,000,000 per loss.

### 4. Defense Costs

The policy of insurance in its insuring clause "A," provides that the "insurer will pay ... all losses which the Directors and Officers ... shall become legally obligated to pay." Section 1(D) of the policy provides that a "loss ... shall include but not be limited to ... defense of legal actions...." In addition, § 5(C) of the policy provides:

> The Insurer may at its option and upon request, advance on behalf of the Directors or Officers, or any of them, expenses which they have incurred in connection with claims made against them, prior to disposition of such claims, provided always that in the event it is finally established the Insurer has no liability hereunder, such Directors and Officers agree to repay to the Insurer, upon demand, all monies advanced by virtue of this provision.

In this case, the various directors and officers who are third-party plaintiffs, ask for summary judgment declaring that ACC

---

11. As already pointed out, *Atlantic Permanent* is based, to a large degree, on a finding that § 4(D) of the policy is ambiguous and, therefore, it is construed in the insured's favor. Because the court is not ruling on the ambiguity question here, as it is concluded based on the merits that loans in question are multiple losses under the policy, *Atlantic Permanent* is not applicable to the instant case. However, if the court were to rule on the ambiguity question, *Atlantic Permanent* would support the conclusion the court reaches today. In that case, the court noted that under Virginia law ambiguities in insurance contracts were construed against the insurer, and the same can be said for Tennessee law. *Webb v. Insurance Co. of North America,* 581 F.Supp. 244, 250–51 (W.D.Tenn. 1984); *Union Planters Corp. v. Harwell,* 578 S.W.2d 87, 92 (Tenn.App.1978). As a result, if *Atlantic Permanent* were followed and an ambiguity was found in the language of § 4(D) of the policy, that ambiguity would be construed against ACC, and again a finding of multiple losses would result.

has a present duty to currently pay fees, costs, and expenses incurred in defense of the claims against them by the FSLIC. The dispute involves the question of whether the insurer must pay attorney fees, costs, and expenses as they are incurred or whether it may wait until the end of the case which determines the liability of the insured.

 An examination of the applicable policy language leads to the conclusion that ACC must pay for the officers' and directors' defense costs as payment for these costs becomes due. Insurance policies and their endorsements are to be read as a whole, with all provisions of the policy being construed together. *Garner v. American Home Assurance Co.*, 62 Tenn.App. 172, 460 S.W.2d 358, 361 (1969). Reading the instant policy as a whole, it is clearly a liability, rather than an indemnity policy, as can be seen from the title of the policy and the provision in § 1(D) of the policy that losses are to be paid by ACC when there is a legal obligation to pay, rather than after the officers and directors have actually paid out under a determination of liability. *See Little v. MGIC Indemnity Corp.*, 836 F.2d 789 at 793 (3rd Cir.1987); *Okada*, 823 F.2d at 280. The insuring clause "A" plus the definition of the word "loss" requires the insurer to pay for defense of the legal action when the officers and directors "shall become legally obligated to pay." This clearly indicates a duty on the insurer to pay expenses and costs when they are incurred and fees when they are billed, for in such instances the directors and officers have become legally liable to pay them.

Section 5(C) of the policy, which speaks of an option to pay expenses, is not inconsistent with this analysis. It speaks in terms of "advances," and if we assume that there is no intention to provide inconsistent provisions in the policy, "advancing" expenses must mean providing funds for expenses before there is an obligation on the part of the officers and directors to pay them. That is clearly not the case here, as the third-party plaintiff officers and directors only want a declaration of a duty by ACC to pay currently the fees, costs, and expenses which they have already become legally obligated to pay. In addition to providing an option to advance expenses before a legal obligation to pay, § 5(C) provides a procedure to pay expenses and to protect the insurer in the event it is finally determined that there is no liability.

The most that can be said in favor of ACC's position is that § 5(C) of the policy creates an ambiguity with insuring clause "A" and the definition of a loss in § 1(D). If this is true, the ambiguity must be resolved in favor of the insured, and the result remains the same: the insurer must pay defense costs as they are incurred and fees when they are billed. *See Little*, 836 F.2d at 794–96; *Okada*, 823 F.2d at 281; *ACC v. Bank of Montana Sys.*, 675 F.Supp. 538, 543–44 (D.Minn.1987).

Accordingly, ACC's motion for summary judgment as to defense costs is denied and the officers' and directors' motions for summary judgment are granted as to defense costs. ACC must pay the defense costs of the officers and directors when they become legally obligated to pay them (when the defense services are rendered and a bill for payment is submitted), provided the other provisions of § 5(C) are complied with.

## PART II

In this case, the FSLIC was appointed receiver of Knox Federal Savings and Loan Association (Knox) in November of 1984. After being appointed receiver, the FSLIC began to collect on all remaining assets of Knox pursuant to its liquidation of that institution. The FSLIC subsequently filed this action against several former officers and directors of Knox, alleging that four of them conspired to give control of Knox to C.H. Butcher in breach of their duty of loyalty to Knox, and the FSLIC also alleged that these defendants breached their duties of care to Knox by approving twenty-five loans and loan participations that were unsafe and unsound, and under which Knox sustained losses. All defendants have answered the complaint and filed numerous affirmative defenses. The matters in this Part II now come before the court

on the motion of the FSLIC for partial summary judgment, or in the alternative, to strike affirmative defenses and motion in limine. The parties have fully briefed the issues and oral argument has been heard. The court will now rule upon this motion.

The FSLIC wants two types of affirmative defenses asserted by the defendants in this case stricken; that the FSLIC was contributorily negligent in its capacity as receiver of Knox, and that the FSLIC failed to mitigate damages in its collection of Knox assets. The FSLIC also wants all evidence relative to its efforts to collect Knox assets excluded at trial. The FSLIC points to three recent cases where courts have concluded that, based on considerations of public policy, decisions made by the FSLIC (or the FDIC) concerning the collection of assets of a failed banking institution should not form the basis of a reduction of the recovery against wrongdoing former bank officials. Defendants respond that these cases are distinguishable, that as to the mitigation of damages defenses these cases do not apply, and that these cases constitute bad policy, alleging they are based on the assumption that the officer and director defendants are indeed guilty of wrongdoing even before that issue is decided by a jury.

 Federal Rule of Civil Procedure 12(f) motions to strike are generally disfavored, but are within the sound discretion of the trial court. *FSLIC v. Burdette*, 696 F.Supp. 1183, 1186 (E.D.Tenn.1988); *FDIC v. Butcher*, 660 F.Supp. 1274, 1277 (E.D. Tenn.1987); *FDIC v. Berry*, 659 F.Supp. 1475, 1479 (E.D.Tenn.1987). Such a motion seeks to strike affirmative defense that are insufficient, redundant, immaterial, impertinent, or scandalous. *Burdette*, 696 F.Supp. at 1186; *Butcher*, 660 F.Supp. at 1277. An affirmative defense is insufficient if, as a matter of law, the defense cannot succeed under any circumstances. *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953); *Burdette*, 696 F.Supp. at 1186–87; *United States v. Hardage*, 116 F.R.D. 460, 463 (W.D.Okla.1987).

Federal Rule of Civil Procedure 56(d) permits partial summary judgment to dismiss affirmative defenses. *County of Hennepin v. Aetna Casualty & Surety Co.*, 587 F.2d 945, 946 (8th Cir.1978). Summary judgment should be granted when the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *McKee v. Cutter Laboratories, Inc.*, 866 F.2d 219, 220 (6th Cir.1989). All inferences drawn from the facts must be viewed in a light most favorable to the non-moving party, *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *Roland v. Johnson*, 856 F.2d 764, 769 (6th Cir.1988), and there is no genuine issue unless there is sufficient evidence favoring the non-movant for a jury to return a verdict for that party (if the evidence is merely colorable, or is not significantly probative, summary judgment may still be granted). *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *McKee*, 866 F.2d at 220.

The three cases cited by the FSLIC in support of its motion recognize public policy considerations that indicate that the FSLIC or the FDIC, when attempting to collect the assets of a failed or failing banking institution, are to be treated differently than a typical plaintiff in a civil case. The first such case is *FSLIC v. Roy*, No. JFM–87–1227, 1988 WL 96570 (D.Md. June 28, 1988). In that case, the FSLIC/Corporate, as assignee of an insolvent savings and loan, sued former bank officials alleging negligence in the approval of twenty-seven commercial loans. Defenses of contributory negligence and assumption of the risk were directed at the FSLIC for actions taken after the loans were made and the FSLIC had assumed supervisory control over the bank (it never went into receivership). The court held that the FSLIC's alleged negligence was immaterial as to any of its case against the bank officials, based on the following reasoning:

If officers and directors have negligently recommended and approved a significant number of loans in their institution's portfolio (a fact which may be assumed here since otherwise the question of proximate cause would be irrelevant), they have breached this duty. One of the proximate results of this breach is that FSLIC must assume at least some degree of control over the affairs of the institution. That is the only causal connection which may properly be required by application of the doctrine of proximate cause. FSLIC has been created for the purpose of preserving the integrity of the national banking system by providing an insurance fund to cover the deposits of failed and failing institutions. FSLIC owes no duty to those institutions or to those whose negligence has brought them to the brink of disaster. Self-evidently, it is the public which is the intended beneficiary of FSLIC, just as it is the public which is the beneficiary of the common law duty imposed upon officers and directors to manage properly the institutions entrusted to their care. Thus, nothing could be more paradoxical or contrary to sound policy than to hold that it is the public which must bear the risk of errors of judgment made by its officials in attempting to save a failing institution—a risk which would never have been created but for defendants' wrongdoing in the first instance.

Slip op. at 4–5.

The second case is *FDIC v. Carlson*, 698 F.Supp. 178 (D.Minn.1988). Inn that case, the Chokio State Bank was closed, the FDIC was appointed receiver, and then it sold the bank's claims for negligence against former bank officials to the FDIC/Corporate which then sued. Contributory negligence was alleged against the FDIC as receiver for its failure to maximize available recovery on bad loans. The court held that there was no duty on the part of the receiver owed to the bank officials to collect bad loans without negligence, citing *Roy*, and without such a duty the contributory negligence defense could not be maintained. 698 F.Supp. at 179.

The final case is *FDIC v. Greenwood*, No. 87–3266 (C.D.Ill. February 24, 1989). In that case, the FDIC in its corporate capacity was again attempting to recover from former officials of a bank which had suffered losses. The FDIC filed a motion in limine asking that the court exclude evidence that tended to diminish any right of recovery the FDIC had based on FDIC decisions concerning the collection of the bank's assets. The defendants in that case wanted to introduce evidence that as to certain loans there existed sources of repayment, therefore in reality no losses were incurred on the loans in question that defendants could be held responsible for. The court, relying on *Roy* and *Carlson*, again found no duty to collect assets that ran in favor of the defendants and concluded that FDIC decisions on asset collection could not form the basis for a reduction of FDIC recovery. Slip op. at 2–3.

In cases of the failure of a savings institution, it is important to the public that the receiver rapidly and efficiently convert the assets of that institution to cash to repay the losses incurred by the insurance fund and the depositors for deposits not covered. Suits by the FSLIC as a receiver to recover assets, or to recover damages for wrongdoing, should not be encumbered by an examination in court of the correctness of any specific act of the FSLIC in its receivership. The rule that there is no duty owed to the institution or wrongdoers by the FSLIC/Receiver is simply a means of expressing the broad public policy that the banking laws creating the FSLIC and prescribing its duties are directed to the public good, and that every separate act of the FSLIC as a receiver in collecting assets is not open to second guessing in actions to recover damages from wrongdoing directors and officers. If there is no wrongdoing by the officer or director, there can be no liability, but if wrongdoing is established, the officer or director should not be allowed to set up as a defense a claim that would permit the detailed examination of the FSLIC's action as a receiver.

When an individual becomes an officer or director of a savings and loan, they are aware that if that institution becomes insol-

vent, federal banking laws and regulations require that a receiver be appointed, often the FSLIC, to marshal the institution's assets as promptly as possible to avoid further injury to the insurance fund and the public at large. The special urgency required in the liquidation of a savings and loan, and a commercial bank, is a result of the special nature of the insurance fund and the procedure for collection and disbursements of assets as provided by Congress. This is a fact any officer or director of that institution should be aware of. Consequently, a director or officer of a failed savings and loan accused of wrongdoing should not be entitled, and should not be surprised by an inability, to examine the conduct of a receiver of a failed institution in an attempt to reduce the recovery of the receiver in subsequent civil actions by the receiver.

█ As a result, the court believes that the cases cited above are soundly decided and applicable to the instant case. The affirmative defenses at issue should be struck, as these defenses would require the public to bear the possible errors of judgment by the FSLIC as receiver rather than the persons found to be guilty of wrongdoing, and removing these defenses will help the court and the jury focus on the real issues presented in the pleadings. To hold otherwise would invite a flood of evidence as to every FSLIC discretionary decision concerning the collection of Knox assets, and could easily distract the jury from making the primary determination of liability or the lack thereof of the defendant officers and directors.

The court is not persuaded by the arguments made by the officers and directors against the application of these three cases to the instant case. As to their attempts to distinguish these cases, contrary to their contentions, at least one of these cases, *FDIC v. Carlson*, does involve conduct by the FDIC/FSLIC in its receivership capacity, therefore these cases cannot be limited in application only to the FSLIC in its corporate capacity.[12] As to the applicability of the doctrine from these cases to a mitigation of damages defense, even accepting the directors' and officers' contention that a mitigation defense does not require the existence of a duty by the FSLIC to the former bank officials, this does not alter the court's holding. Whether a duty is owed by the FSLIC to the defendants in this case or not, the policy against having the public bear any losses due to errors in judgment by the FSLIC as a receiver of a failed institution still applies, and the court's concern that the jury could be distracted by excessive evidence concering the discretionary decisions by the FSLIC as receiver of Knox will exist as long as the mitigation defense remains in this case. Finally, the court does not agree with the officers' and directors' argument that its holding results in a premature determination of their liability. As pointed out in *Roy*, the defenses of contributory negligence or mitigation of damages are only relevant if it has been determined that a defendant has indeed engaged in some action which makes the defendant liable to the plaintiff. Here, if the officers and directors are found not liable for any losses to Knox, it really does not matter if the FSLIC as receiver of Knox did anything negligent or not. As a result, what the court is holding is that assuming that the officers and directors are found liable, the contributory negligence and mitigation defenses will not be available to them.

Accordingly, the FSLIC's motion to strike affirmative defenses is granted, and the following affirmative defenses are ordered struck:

12. In a related vein, the officers and directors argue that in these three previous cases, the interests of the FSLIC/FDIC in its corporate capacity were involved, therefore the concern over the preservation of the insurance was at issue. They attempt to distinguish the instant case in this regard, contending that since FSLIC/Corporate is not involved here, this concern over the insurance fund is not present, therefore these cases are not applicable. However, this is not an accurate contention, as the FSLIC/Corporate paid off the Knox depositors out of the insurance fund, therefore it is the biggest creditor of Knox, and will benefit directly from the collection efforts of the FSLIC/Receiver.

Burdette — ¶ 130(a)

A. Curtis — ¶ 132 of answer to complaint (post-receivership conduct only)
¶ 23 of answer to amended complaint

Estate of H. Curts — ¶ 43 (post-receivership conduct only)

W. Curtis — ¶ 30 (post-receivership conduct only)

Downing — ¶ 2(E) (post-receivership conduct only)
¶ 2(G)

Joe Duncan — ¶ 2(e) (post-receivership conduct only)
¶ 2(g)

Estate of J. Duncan, Sr. — ¶¶ 42, 54, 55(a), 55(b)
¶ 50 (post-receivership conduct only)

Newman — ¶ 22 (post-receivership conduct only)
¶ 24

Regas — ¶ 23

Ridge — ¶ 21 (post-receivership conduct only)
¶ 23

Rutherford — ¶ 25
¶ 26 (post-receivership conduct only)

Estate of Stair — ¶ 134 (post-receivership conduct only)

As to the FSLIC's motion in limine, the motion is denied without prejudice. At the present time the court cannot rule on this motion, as there has not been sufficient evidence presented as to the type of evidence that the FSLIC wishes excluded, or as to what specific evidence the officers and directors intend to introduce that might be subject to a FSLIC motion. The court will reconsider this matter if appropriate motions are filed at a later date, and at that time the court will examine the evidence in light of the standards set out in this order.