In re NANOVATION TECHNOLOGIES, INC. and Nanovation Technologies of Michigan, Inc., Debtors.

Barry Chatz, Chapter 7 Trustee of the Estates of Nanovation Technologies, Inc. and Nanovation Technologies of Michigan, Inc., Plaintiff,

v.

National Union Fire Insurance Co., et al., Defendants.

Bankruptcy No. 01 B 26090.
Adversary No. 02 A 1680.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 27, 2006.

Kathryn Gleason, Office of the U.S. Trustee, Chicago, IL.

Barry Chatz, Trustee, Thomas P. Yardley, Arnstein & Lehr, LLP, Chicago, IL, for trustee.

Diane M. Baron, Clausen Miller P.C., Chicago, IL, for National Union.

Michael P. Tone, Kimberly E. Blair, Ross, Dixon & Bell, LLP, Chicago, IL, for Twin City.

Janet R. Davis, Anne L. Blume, Meckler, Bulger & Tilson, Chicago, IL, for Federal.

Michael E. Geltner, Geltner & Associates, PC, Washington, DC, for James Davidson.

Michael D. Freeborn, Todd J. Ohlms, Freeborn & Peters, LLP, Chicago, IL, for Stephen Barney, Dr. Gary Bjorklund, Howard Gitten.

Michael O'Rourke, Brian M. Dougherty, O'Rourke, Katten & Moody, Chicago, IL, for Joseph Carr.

Therese King, Mayer, Brown, Rowe & Maw, Chicago, IL, for Daniel Dorman.

Garrett B. Johnson, Steven C. Seeger. Kirkland & Ellis, LLP, Chicago, IL, for David Grubb.

## MEMORANDUM OPINION

PAMELA S. HOLLIS, Bankruptcy Judge.

Nanovation Technologies, Inc., along with its affiliate Nanovation Technologies of Michigan, Inc. (collectively, "Nanovation"), was a high tech company founded in the mid–1990s with the goal of developing and marketing a photonic integrated circuit. Like so many of the companies working on cutting-edge technology products during the dot-com boom, Nanovation eventually closed its doors without ever turning a profit or even bringing in more than nominal revenues. Unlike many of those companies, however, Nanovation filed for relief under Chapter 11 of the Bankruptcy Code in the summer of 2001.

On November 20, 2001, Nanovation's bankruptcy case converted to Chapter 7, and Barry Chatz was appointed as the case trustee. Chatz sold Nanovation's equipment and intellectual property, and then on May 7, 2002, he filed an adversary complaint against certain of Nanovation's directors and officers (the "D & O Complaint"). Or, as one defendant characterized the Trustee's description of work in this case: "[f]irst we sold all the equipment, then we sold the IP, and then the next step is we're going to go after the D & O insurance." [1]

The defendants in the D & O Complaint are former directors Stephen Barney, James Davidson, Joseph Carr, David Grubb and Daniel Dorman, former officers and directors George Robert Tatum (and a related limited partnership), Robert Chaney, John Kenning, Gary Bjorklund and

---

1. Statement attributed to Trustee's attorney. Ex. 33 at 23:20–22.

Robert Bratter, former officers Seth Joseph (and two related limited partnerships) and Mclba Chan, and former general counsel Howard Gitten. Davidson is also the third party plaintiff in an action against National Union, Federal and Twin City. His third party complaint was consolidated with this underlying adversary by order dated December 27, 2002.

Shortly after filing the D & O Complaint, Chatz filed another lawsuit, seeking declaratory judgment against the three insurance companies that had issued Nanovation's directors and officers liability policies: National Union Fire Insurance Company of Pittsburgh, PA, Federal Insurance Company and Twin City Fire and Insurance Company. The insurers had all denied coverage under the policies to the defendants in the D & O Complaint. In the declaratory judgment complaint, Chatz seeks a finding that the policies are assets of the bankruptcy estate and that coverage exists under the policies.

Six cross-motions for summary judgment were filed in that declaratory judgment complaint. The parties fully briefed the motions, and the court took them under advisement. For the reasons stated in this Memorandum Opinion, the motions for summary judgment brought by National Union, Federal and Twin City are granted, and those brought by the Trustee, by the Intervenor–Plaintiffs (Barney, Bjorklund, Carr, Dorman, Grubb and Gitten) and by James Davidson are denied.

### JURISDICTION

1. This adversary proceeding is a civil proceeding arising under the Bankruptcy Code or arising in or related to a case under the Bankruptcy Code within the meaning of 28 U.S.C. § 1334(b).

2. This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and Internal Operating Procedure 15(a) of the U.S. District Court for the Northern District of Illinois because this action is related to Nanovation's underlying bankruptcy case.

3. This is a core proceeding under 28 U.S.C. § 157. Venue of this adversary proceeding is proper in this court under 28 U.S.C. § 1409(a).

### UNCONTESTED FACTS

#### The Insurance Policies

4. At the time of the acts alleged in the D & O Complaint, Nanovation had three separate directors and officers liability policies of insurance. Joint Statement of Undisputed Material Facts at ¶ 25 ("JS"). The primary policy was issued by National Union with an original policy period of October 8, 2000 to October 8, 2001, and a limit of $5 million (the "Primary Policy"). JS at ¶ 27. National Union is a subsidiary of American International Group, Inc. ("AIG"). Second Amended Complaint (Adv. No. 02–1680) and Answer of National Union at ¶ 8.

5. Although Nanovation was a Delaware corporation, at the time the Primary Policy was issued its executive offices were located in Florida and its research facilities in Michigan. JS at ¶ 29. By July 2001, Nanovation's principal offices had moved to Northville, Michigan. Ex. 25 at 35:4–6.

6. The Primary Policy was delivered to Nanovation's office in Florida. JS at ¶ 29. Additionally, the Nanovation employee who negotiated the policies, Vice President of Finance and Treasurer John Ofenloch, did so at the company's Florida office. JS at ¶ 37. Ofenloch worked with Marsh & McClennan in obtaining quotes for the D & O insurance and other types of insur-

ance on Nanovation's assets. Ex. 25 at 9:13–16.

7. Pursuant to Endorsement # 14 to the Primary Policy, effective July 26, 2001, National Union extended the term of the Primary Policy six months so that the policy remained in effect from October 8, 2000 to April 8, 2002. Ex. 4 and JS at ¶ 30.

8. Federal issued a first layer excess policy to Nanovation, with effective dates from October 8, 2000 to October 8, 2001 (the "First Layer Excess Policy"). This policy provided $10 million in additional coverage. Twin City also issued a $10 million excess policy to Nanovation with effective dates from October 8, 2000 to October 8, 2001 (the "Second Layer Excess Policy"). JS at 31–34.

9. The First Layer Excess Policy and Second Layer Excess Policy are what are commonly known in the insurance industry as "following form" policies, which means that they followed and included the terms and conditions of the Primary Policy. JS at ¶ 35. The excess policies provided that:

> The Company shall provide the Insureds with insurance during the Policy Period in excess of the Underlying Insurance. Coverage hereunder shall attach only after such Underlying Insurance has been exhausted and shall then apply in conformance with the terms, conditions and endorsements of the Primary Policy, except as specifically set forth in any terms, conditions and endorsements of this policy.

JS at ¶¶ 41–42. Federal and Twin City delivered their policies to the same Florida address as did National Union. JS at ¶ 36.

10. Ofenloch received quotes from Nanovation's insurance broker, Marsh, on extending all three policies, but the board of directors extended only the Primary Policy. "At the time, given the cash—or cash situation at the time, we went with the policy we could afford." Ex. 25 at 41:16–18.

11. The Primary Policy is a claims-made policy—in other words, it covers only *claims made* during the policy period rather than claims arising out of *occurrences* during the policy period. The coverage provided as follows:

**COVERAGE A: INDIVIDUAL IN-SURED INSURANCE**

> This policy shall pay the Loss of each and every Director, Officer or Employee of the Company arising from a Claim first made against such Insureds during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Directors, Officers or Employees of the Company except when and to the extent that the Company has indemnified such Insureds. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

JS at ¶ 38.

12. If Nanovation became aware of any circumstances that might give rise to a claim, it could trigger coverage under a special "notice of circumstances" clause in the Primary Policy, even if no claim was made during the policy period:

**7. NOTICE/CLAIM REPORTING PROVISIONS**

> (c) If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for

anticipating such a Claim, with full particulars as to dates, persons and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based on or attributable to such circumstances or alleging any Related Wrongful Act to such circumstances, shall be considered made at the time such notice of such circumstances was given.

JS at ¶ 39.

13. Nanovation also had a Technology Liability Insurance Policy (the "ProTech Policy"), issued by American International Specialty Lines Insurance Company, a different member company of AIG from National Union. Trustee's Ex. 70. That policy indicated that coverage would be provided for claims made during the policy period or:

> If during the policy period ... you become aware of any facts or circumstances that may reasonably be expected to give rise a claim against you for a wrongful act that occurs prior to the end of the policy period and provided you give written notice to us during the policy period ... of the circumstances and the reasons for anticipating such a claim, with full particulars as to the wrongful act(s), dates, persons and entities involved, then any claim that is subsequently made against you arising out of such wrongful act or the same wrongful act(s) or series of continuous, repeated or related wrongful acts, shall, for the purposes of this policy, be treated as a claim made against you and reported to us during the policy period.

*Id.* at Section L. This policy had a $5 million limit and effective dates of January 20, 2001 to January 20, 2002. *Id.*

14. The ProTech Policy was a technology liability insurance policy covering claims of wrongful acts in Nanovation's performance of technology services or failure of technology products.

### Nanovation Runs Into Financial Trouble

15. Nanovation's financial condition deteriorated in the summer of 2001. As a result, beginning in June 2001, Lew Rosenbloom of McDermott, Will & Emery advised the board of directors regarding their alternatives. Ex. 33 at 30:3–8. In Rosenbloom's view, a successful Chapter 11 "was the best of all possible worlds because part of that is all the parties agree among themselves that everything is fine. The creditors get some money, get a piece of the company, everybody goes away happy and there's no litigation." *Id.* at 15:10–15.

16. Rosenbloom warned the directors that if Nanovation did not obtain financing in Chapter 11, it would have to convert to Chapter 7 and it is a "roll of the dice" as to whether the trustee would pursue the board. As a result of Rosenbloom's lectures to the board, Bjorklund "at least was explicitly aware at that point there was a possibility that if we went into Chapter 7 we would be sued." *Id.* at 15:24—16:2.

17. On July 25, 2001, the Nanovation companies filed their respective voluntary petitions under Chapter 11, United States Code (the "Bankruptcy Code"). JS at ¶ 1.

18. From the initiation of Chapter 11 proceedings until November of that year, Nanovation focused on obtaining financing. *Id.* at 32:10–15; Ex. 29 at 23:14–22.

19. Even as late as October 2001, Nanovation still had potential investors. Ex. 33 at 34:3–7. It was not until very shortly before the case converted—"two weeks or less"—that the board became aware that conversion was unavoidable and a trustee would be appointed. Ex. 29 at 25:3—26:4; Ex. 33 at 34:7–11.

*Nanovation Notifies the Insurance Companies That It Plans to File for Relief Under the Bankruptcy Code*

20. On July 24, 2001—the day before Nanovation filed its Chapter 11 petition—Chaney, Gitten and Ofenloch had a conference call with Dennis Love and Jack Gocke from Marsh to let them know that Nanovation was contemplating bankruptcy. Ex. 32 at 11:11–18; Ex. 41 at 14:12–20 and 16:2–4.

21. The Nanovation representatives said that no claims had been made against Nanovation. Ex. 41 at 17:6–8. Love then pointed out the section of the Primary Policy which would allow Nanovation to put the insurers on notice of circumstances even though no claims had actually been made. *Id.* at 17:8–10 and 19–21.

22. As it turns out, Love's directions were superfluous. Ofenloch had already written a "notice of circumstances" letter to Gocke the day before (the "Ofenloch Letter"). The Ofenloch Letter reads as follows in its entirety:

> Pursuant to Section 7 of the [full title of policy] we are putting you on notice of potential claims against the Company. The Company is contemplating the filing of a Chapter 11 bankruptcy petition and believe that such filing will give rise to claims being filed against the Company, its Board and Officers. We will advise you of the specifics of the claims as the Company becomes aware of them.
>
> If you have any questions, please contact me at 734–351 0691.

Ex. 7.

23. Love received the Ofenloch Letter after the conference call. *Id.* at 58:10–12. He reviewed it and thought that it reflected what the Nanovation representatives had said during the conference call. *Id.* at 62:7–8.

24. After he received the Ofenloch Letter, Love composed the cover letters dated July 25, 2001, that were sent to National Union, Federal and Twin City (or their parent company) with the Ofenloch Letter enclosed. *Id.* at 62:11–22. He requested that each insurer "accept this as notice of circumstances that may give rise to a claim under the above-captioned policy, as well as any other applicable policies." Love also stated that "[i]f you should require additional information, please contact Mr. John Ofenloch ...". Exs. 8, 10 and 11.

25. The Ofenloch Letter has been the subject of intense scrutiny in these motions for summary judgment. Interestingly, no-one wants to claim authorship of the letter. Not Ofenloch, who signed it, Ex. 25 at 7:7–18, not his boss, Chaney, Ex. 32 at 8:7–8, and not Love at Marsh, Ex. 41 at 17:18–19. Nevertheless, at least two people at Nanovation reviewed it before Ofenloch sent it out, Chaney and Gitten. Ex. 32 at 8:10–12.

26. Neither Ofenloch nor Chaney reviewed the Primary Policy in connection with sending the Ofenloch Letter. *Id.* at 9:5–13; Ex. 25 at 9:11–15 Chaney testified that "[w]e relied solely on Lew Rosenbloom and his team at McDermott ...". *Id.* at 13–16.

27. The intent of the Ofenloch Letter was to advise the insurance companies that Nanovation was going to file for Chapter 11 and "that we don't know what might happen, so we're letting you know that things could happen." Ex. 35 at 25:23–25.

28. According to Bratter, the Ofenloch letter contained as much information as he and the writer of the letter knew at the time, "which is nothing." *Id.* at 26:6–9. The one thing the Nanovation officers, directors and attorneys could agree on was that no claims had been made against Nanovation. Ex. 32 at 12:24—13:18 (Chan-

cy); Ex. 25 at 10:11–15 (Ofenloch); Ex. 33 at 12:18–22 (Bjorklund).

29. Furthermore, neither Bjorklund, Davidson, Bratter nor Carr were aware of any wrongful acts committed by the directors and officers on or before July 23, 2001, when Ofenloch sent his letter. Ex. 33 at 13:20–24 (Bjorklund); Ex. 37 at 18:13–16 (Davidson); Ex. 35 at 10:17–22 (Bratter); Ex. 31 at 10:24–11:3 (Carr).

30. Stamford International (Nanovation's largest shareholder) was the most concrete threat that Nanovation's general counsel Gitten perceived as filing suit against Nanovation, and even those were fuzzy. Ex. 29 at 26:15–22. While Gitten was aware of veiled threats from Stamford, Stamford never actually made a claim. *Id.* at 66:17—67:6. In fact, Gitten testified that he had "no reason to report to the insurance companies" any more facts than "what we conveyed to Marsh"— that Nanovation intended to file for relief under Chapter 11. *Id.* at 27:5–12.

31. Joseph Carr was also aware of threats by Stamford and by an individual named Mel Reeves but never communicated any of this information to Nanovation's insurers or to Marsh. Ex. 31 at 9:13—10:11.

32. By the time Ofenloch left Nanovation on November 19, 2001, he *still* had never learned of any specifics of the potential claims alluded to in his letter. Ex. 25 at 10:19–24. Not knowing any further details of possible claims, even though nearly five months remained on the Primary Policy when he left Nanovation, Ofenloch never supplemented his letter. *Id.* at 12:6–10.

*The Insurance Companies Respond*

33. On August 10, 2001, Nancy Pease ("Pease"), on behalf of Federal, wrote Ofenloch acknowledging receipt of the Ofenloch Letter and advising that

As Federal's Policy is follow-form to the Primary Policy and National Union has not yet issued its coverage opinion, we are unable to advise of our coverage position at this time. Please provide the undersigned with the coverage position issued by the [sic] National Union. Once we receive and review their position, Federal will analyze with respect to this matter. In the interim, Federal must reserve all rights under the Excess Policy and Primary Policy, and those available at law to take any and all reservation of rights, deny coverage and/or rescind the Excess Policy based on any and all terms, conditions, exclusions, endorsements and provisions of the Excess Policy and Primary Policy, including representations, statements, declarations and omissions in the applications therefor.

Ex. 13. Marsh also received a copy of that letter. Ex. 41 at 35:14–16. That same day, Pease also wrote to National Union requesting a copy of its coverage position. Ex. 12.

34. When Federal is an excess insurer, it generally waits for the primary insurer to determine whether a notice of circumstances letter complies with the primary policy. Ex. 42 at 30:7–8.

35. Larry Fine is a vice president and was formerly a complex claims director at AIG Technical Services, Inc. ("AIGTS"). Ex. 27 at 6:7–11. AIGTS is a member of AIG. Ex. 14.

36. Fine manages the claims group at AIGTS that handles directors and officers claims. Ex. 27 at 8:23—9:3. He assigned the Ofenloch Letter to Sylvia Toyos, and on August 17, 2001, Fine wrote the following letter to Love:

This is to acknowledge receipt of your notice dated July 25, 2001 regarding the above referenced matter. Sylvia Toyos, the Claims Director assigned to handle

this matter, can be reached at (212) 458–1106. Our office received your notification regarding policy # 473–6481 on July 30, 2001.

In the near future, Sylvia will issue a coverage opinion addressed to you. To the extent that other insurance might provide coverage for this matter, you may want to consider providing notice to other insurance carriers.

Claims service is important to us. Should you have any concerns regarding the handling of this matter, please call me at (212) 458–1065.

Ex. 14.

37. There were no specific rules, guidelines or policies given at AIGTS regarding a time frame for responding to a notice of circumstances, Ex. 27 at 20:21—21:6 and 24:17–25, although Toyos had an understanding that generally she should try to respond within 30 days, Ex. 26 at 40:2–9. Fine's typical response time to a notice of circumstances letter varied from a day to a few months, depending on factors as disparate as "difficulties in getting the relevant policy, vacation times, juggling case loads." Ex. 27 at 25:2–12.

38. At the same time that Love wrote to National Union, Federal and Twin City and forwarded the Ofenloch Letter to them, he also wrote to Thomas Kopp, Assistant Vice President at National Union, regarding the ProTech Policy. Ex. 9. Although National Union is a subsidiary of AIG, it did not issue the ProTech Policy.

39. On August 28, 2001, claims analyst Brian Thornton of AIGTS wrote to Ofenloch regarding the notice of circumstances letter Ofenloch sent under the ProTech Policy. Trustee's Ex. 71. Thornton wrote that:

A file has been established under the Insured's ProTech Policy No. 872–4736, with effective dates of January 20, 2001 to January 20, 2002. . . . Please refer to the above claim number on all future correspondence.

A review of the documentation provided reveals that this is notice of potential claims as the insured may file Chapter 11 and believes that such filing will give rise to claims against the insured and or its board and officers.

With this in mind we would like to refer you to the definition of claim, which states:

*Claim(s) means:*

1. *A demand for money, services, non-monetary or injunctive relief; or*

2. *A suit(s) including a civil, criminal or arbitration proceeding for monetary or non-monetary relief.*

At this time a claim has not been made as there has been no demand or suit filed. This file will be closed. If a claim should arise from the above situation, please submit it to us at that time.

If you have any questions or wish to discuss this matter further, please give me a call.

Trustee's Ex. 71.

40. Twin City's file with respect to Nanovation was destroyed during the September 11 tragedy. JS at ¶ 57. On October 18, 2001, after the Second Layer Excess Policy expired and as part of Twin City's reconstruction of its files, Michael Morabito, the assigned claims handler at Twin City, requested a copy of the Ofenloch Letter from Marsh. JS at ¶ 58. Marsh sent it that same day, along with a copy of the Primary Policy. Ex. 15 and JS at ¶ 53.

41. After September 11, 2001, AIGTS was closed for a week. A necessary catch-up period followed. Ex. 26 at 115:25–116:18.

42. More than five months before the Primary Policy expired, on October 29, 2001, Toyos, on behalf of the Primary Policy Carrier, wrote a letter to Love with National Union's preliminary determination of coverage. Ex. 16.

43. Toyos' October 29, 2001 letter advised that the Ofenloch Letter does not constitute notice in accordance with clause 7(c) of the Primary Policy, because it "does not set forth the circumstances or reasons for anticipating such a Claim nor does it provide full particulars as to dates, persons and entities involved. Accordingly, we cannot accept Nanovation Technologies, Inc.'s letter by Mr. Ofenloch as notice in accordance with the policy provisions."

44. While Toyos' letter is straightforward and businesslike, Fine gave a more informal description of why the Ofenloch Letter was rejected by National Union:

A: ... [T]his is probably the worst notice of circumstance letter that I ever saw, with absolutely no details. And that if this was sufficient notice, then no one would ever buy another policy after sending a letter like this . . . .

Q: Okay. Why is this the worst notice of circumstances letter you've ever seen?

A: Because I can't honestly begin to figure out what types of claims they're anticipating, based on an adverse business development, filing for bankruptcy.

I don't know if they've done anything wrong that I should know about. I have no idea.

Ex. 27 at 92:8–22.

45. Toyos did not ask Nanovation for more particulars, because her letter indicates that "[t]he above coverage evaluation is premised upon information furnished to date, and by necessity, subject to change as additional facts are forthcoming." Ex. 16. As a result, she testified at her deposition, if Nanovation had anything further "they can send [it] to me." Ex. 26 at 126:16.

46. After all, the Ofenloch Letter had promised to advise National Union "of the specifics of the claims as the Company becomes aware of them." Ex. 7. Moreover, Toyos knew that "the insured has the policy, and they know what they have to provide." Ex. 26 at 131:4–5.

47. Chancy periodically asked Ofenloch what responses, if any, he had received from the insurance carriers to the Ofenloch Letter. Ex. 32 at 16:5–6. Chaney was aware of a response from Federal and he directed Ofenloch to stay in contact with Low Rosenbloom regarding that response. *Id.* at 20:16—21:14. However, Chaney himself never discussed the Ofenloch Letter with anyone employed by any of the insurers. *Id.* at 10:5–16.

48. Gitten expected Ofenloch would follow up with the insurers regarding the notice that was provided. Ex. 29 at 29:15–22. Nevertheless, Gitten never had a discussion with anyone at Nanovation relative to what responses, if any, had been made by the insurers to the Ofenloch letter. *Id.* at 39:11–19. Gitten did not have any conversations with Marsh after July 24, 2001, as to what responses, if any, had been made by the insurers to the Ofenloch Letter. *Id.* at 36:8–11. Neither did Bratter ever ask Ofenloch or indeed anyone at Nanovation whether they had gotten a response to the letter. Ex. 35 at 15:6–13.

49. After receiving Toyos' letter, no-one from Nanovation ever contacted her about supplementing the defective notice of circumstances before the Primary Policy expired. Ex. 26 at 157:25—158:12 and 200:16—201:13. Even though more than five months remained on the Primary Policy, not a single person associated with

Nanovation emailed, faxed, called or wrote to National Union before the Primary Policy expired to further describe their reasons for anticipating a claim, or about providing more particulars as to the dates, persons and entities involved in a potential claim.

50. Alone among the numerous people involved in Nanovation's notification of its insurance carriers, one person at Marsh contacted just one of the three carriers. Toyos' file notes on Nanovation indicate she received a call from Hugh Dennis of Marsh on December 7, 2001, and that she spoke to him on that date. Ex. 26 at 147:23—148:5. Her file note states as follows:

> Received call and spoke with Hugh Dennis, broker, Marsh. (202) 263-7783.
>
> I advised I did not have file in front of me at time of conversation, nor my coverage letter. It appears that we did not accept as notice under 7(c).
>
> He wanted to know a hypothetical because the Insured is or will be filing Chapter 7.
>
> I advised that I verbally could not respond to a hypothetical as to what would constitute notice, but did advise to send me whatever information he had and we would review same and respond in writing. I told him that I could not verbally change a coverage opinion, and could not advise him without seeing whatever he would be sending me.
>
> He wanted to know more about Clause 7(c) and I advised as per same.

Ex. 17.

51. Dennis did not provide Toyos with any additional information after that December 7 phone conversation. Ex. 26 at 154:7–155:14. Even that one brief contact led nowhere, and provided to National Union no more particulars regarding potential claims or specifics regarding circumstances that could give rise to a claim.

52. On February 12, 2002, Morabito, on behalf of Twin City, wrote Love, and carbon copied Ofenloch, stating, "Mr. Ofenloch's letter does not appear to satisfy the specificity requirements of the potential claims reporting clause of the Primary Policy so as to permit treating a subsequently made claim as being first made at the time the initial notice of circumstances was provided to us." Ex. 18.

### The Excess Policies Expired on October 8, 2001, and the Primary Policy Expired on April 8, 2002

53. As of October 8, 2001, when the excess policies expired, Barney, Bjorklund, Carr, Davidson, Dorman, Gitten, Grubb, Kenning and Tatum did not know that a trustee would be appointed in this case., Fed. Ex.'s 1–10, Responses to Federal Insurance Company's First Request for Admission, at ¶ 8. Neither did these eventual defendants know that the future Trustee would make claims against any Nanovation director or officer until after that date. *Id.* at ¶ 6, 7.

54. The Primary Policy, the only one of the three policies to be extended, expired by its terms on April 8, 2002. It was not until after April 8, 2002, that Barney, Bjorklund, Bratter, Davidson, Dorman, Gitten, Grubb and Kenning learned that the Trustee would make claims against any Nanovation director or officer. Nat. Union Exs. 1–8 at ¶ 8.

55. Even by April 8, 2002, neither Bjorklund, Bratter nor Tatum knew of any wrongful acts by the officers and directors. Ex. 33 at 24:15–18; Ex. 35 at 13:10–14; Ex. 34 at 13:17–21. Carr did not expect that any of the officers and directors would be sued. Ex. 31 at 14:4–21. Chaney was not aware of any legal claims that were being made against the officers and directors. Ex. 32 at 23:16–19. Neither

Kenning nor Davidson had any knowledge of any potential claims against Nanovation or any of its directors or officers. Ex. 39 at 13:23—14:3; Ex. 37 at 19:11–14. Gitten never saw any document that stated anyone from Nanovation expected to be sued in their fiduciary capacity arising out of the filing of Chapter 11. Ex. 29 at 23:3–8.

***Chatz Files the D & O Complaint, the Parties Notify the Insurers That an Actual Claim Has Been Made, and Coverage is Denied***

56. On May 7, 2002, Chatz filed the D & O Complaint, which was eventually docketed as Adversary 02–592. The First Amended Complaint, filed on July 2, 2002, seeks relief against various directors and officers for alleged breaches of fiduciary duty, as well as the avoidance and recovery of fraudulent transfers to Robert Tatum and related entities, Seth Joseph and related entities, Carr, Davidson and Bratter. Ex. 2.

57. Notification of the insurance carriers began almost immediately. Well after the Primary Policy expired in April, Thomas P. Yardley, one of the Trustee's attorneys, sent a letter dated May 7, 2002, and a copy of the complaint to Marsh and National Union. Ex. 19. On May 9, 2002, Marsh forwarded Yardley's notice of claim to both Chubb, on behalf of Federal, and Hartford, on behalf of Twin City. Ex. 20.

58. On May 14, 2002, Morabito, on behalf of Twin City, issued his coverage declination letter to Marsh and carbon copied Yardley. Ex. 21. On June 14, 2002, Pease, on behalf of the Federal, responded to Marsh that "as the Complaint was filed after the expiration of Federal's policy, coverage is therefore denied." Ex. 23.

59. Between May 14—more than seven months after the excess policies expired and more than a month after the Primary Policy expired—and July 31, 2002, Gitten, Bjorklund, Grubb, Chaney, Carr, David-

son, Bratter, Dorman and Barney provided notice of the D & O Complaint to the insurance companies. Exs. 44–45, 48–49, 51, 54, 57, 60, 63 and 67. This was the first time that Barney, Bjorklund, Bratter, Davidson, Dorman, Gitten, Grubb and Kenning had personally communicated any information concerning any potential claims against themselves, Nanovation or any other Nanovation director or officer to National Union. Nat. Union Exs. 1–8 at ¶¶ 2 and 3.

60. The only communication Carr is aware of to National Union or AIG on or before April 8, 2002, regarding any potential claims against Nanovation, was the Ofenloch Letter. Ex. 31 at 15:17–21.

61. Kenning has never had any discussions with anyone from Twin City, Federal, National Union or AIG. Ex. 39 at 9:16—10:4. Neither has Davidson, Tatum, Dorman or Gitten. Ex. 37 at 14:3–6; Ex. 34 at 12:8—13:13; Ex. 38 at 13:9–18; Ex. 29 at 27:13—28:3. Kenning never discussed the D & O insurance or notice letters with anyone from Marsh. Ex. 39 at 10:5—10:9.

62. On July 26, 2002, David S. Mahaffey ("Mahaffey") of AIG, on behalf of the Primary Policy Carrier, wrote a letter to Gitten, Yardley, Bjorklund and Mark Heatwole of Winston & Strawn, denying coverage for the D & O Complaint:

.... I regret to inform you that coverage is not afforded under the Policy. First, notice of the Claim was not timely. The Policy covers, subject to its terms and conditions, Claims first made against the Insured during the Policy Period and reported in writing to the Insurer. (See Declarations page.) Initially, the Policy Period was October 8, 2000 to October 8, 2001. An expanded Policy Period was then agreed upon— October 8, 2000 to April 8, 2002. Still, it

appears that the adversarial action was not commenced until May of 2002 (i.e., after the Policy had expired) and notice was given to National Union afterwards. Thus, coverage is not afforded because the Claim was not made against the Insured or reported to National Union during the Policy Period.

Ex. 24 (emphasis added).

63. Denial of coverage by National Union, Federal and Twin City to the various directors and officers soon followed. Exs. 46–47, 50, 52–53, 55–56, 58–59, 61–62, 64–66, 68–69. By October 31, 2002, all of the defendants who had provided notice of the D & O Complaint had learned that coverage was denied.

## CONCLUSIONS OF LAW

*I.   Standard for Summary Judgment*

1. The standard for a summary judgment motion is set forth in Fed.R.Civ.P. 56, made applicable in bankruptcy proceedings via Fed. R. Bankr.P. 7056. The Rule provides that summary judgment is proper if the papers and pleadings on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All reasonable inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1032 (7th Cir.1998).

2. A factual dispute is a genuine issue for trial only if it is determinative of the outcome under applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See Frey v. Fraser Yachts,* 29 F.3d 1153, 1156 (7th Cir.1994). Once the motion is supported by a *prima facie* showing that the

moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings. Instead, its response "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c).

3. "The construction of an insurance policy is a matter of law. Summary judgment is an appropriate disposition where such construction is at issue, as here." *Maryland Cas. Co. v. Chicago and North Western Transp. Co.,* 126 Ill.App.3d 150, 81 Ill.Dec. 289, 466 N.E. 2nd 1091, 1095 (1984).

Where no factual disputes exist, but only the interpretation of the content of an insuring agreement and notice, the sufficiency of a notice letter is determined as a matter of law based upon the content of the letter and the allegations contained in a subsequently-filed complaint. A proper analysis of the sufficiency of notice is whether the notice given objectively complied with the potential claim notice provision of a policy.

*Continental Casualty Co. v. Coregis Ins. Co.,* 316 Ill.App.3d 1052, 250 Ill.Dec. 293, 738 N.E. 2nd 509, 518 (2000) (citation omitted). The parties have filed cross-motions for summary judgment, and there are no material disputes of fact. The matter is ripe for disposition by summary judgment.

*II.   Since There is No Conflict Between Illinois and Florida Law. There is No Need for the Court to Engage in a Waiver or Choice of Law Analysis*

4. The Trustee, Intervenor–Plaintiffs and Davidson assert that Florida law is applicable to these motions. From their perspective, even if the Ofenloch Letter was deficient, Florida law required the insurers to respond in 30 days. National Union responded to the Ofenloch Letter

before the Primary Policy expired, but it did not do so within 30 days.

■■■ 5. National Union, Federal and Twin City argue that since the same result occurs under Illinois and Florida law, it is unnecessary for the court to engage in a choice of law analysis. The Trustee, Intervenor–Plaintiffs and Davidson maintain that Fla. Stat. § 627.426(2)(a) does not have a counterpart in the Illinois statutes, and that a conflict therefore exists. Pursuant to this subsection,

(2) A liability insurer shall not be permitted to deny coverage based on a particular coverage defense unless:
(a) Within 30 days after the liability insurer knew or should have known of the coverage defense, written notice of reservation of rights to assert a coverage defense is given to the named insured . . . .

However, § 627.426(2)(a) does not create coverage where none would otherwise exist. Instead, that subsection only applies to denial of coverage based on a particular coverage defense. The existence of a coverage defense assumes that coverage exists but that there is a defense, such as a material misrepresentation on the application for insurance.

The law in Florida is now well-settled with respect to the difference between a "coverage defense" and a denial of coverage. A "coverage defense" is a defense to otherwise-existing coverage. A denial or disclaimer of coverage based on a complete lack of coverage in the first instance is not a "coverage defense." The distinction between the two is significant in that an insurer must give its insured notice, usually through a reservation of rights, of a coverage defense, but the insurer has no such obligation with respect to a total disclaimer of coverage. The failure to provide the insured with notice of a disclaimer of coverage does not effect a waiver of the insurer's right to assert that disclaimer. *Solar Time Ltd. v. XL, Specialty Ins. Co.,* 2004 WL 1683149, *5 (S.D.Fla. June 15, 2004) (citations omitted), *aff'd,* 142 Fed. Appx. 430 (11th Cir.2005).

■■■ 6. The Supreme Court of Florida has spoken on the issue of whether an insurer is precluded from disclaiming coverage if it fails to comply strictly with the requirements of § 627.426(2)(a). "[F]ailure to comply with the requirements of the statute will not bar an insurer from disclaiming liability where a policy or endorsement has expired or where the coverage sought is expressly excluded or otherwise unavailable under the policy or under existing law." *AIU Ins. Co. v. Block Marina Inv., Inc.,* 544 So.2d 998, 1000 (Fla.1989).

■■■ 7. Under a claims-made policy, notice to the insurer is an element of the coverage, and the reporting of the claim is "the triggering event" or the "insuring event." *KPFF, Inc. v. California Union Ins. Co.,* 56 Cal.App.4th 963, 66 Cal.Rptr.2d 36, 43 (1997). "Given the purpose and function of the reporting requirement in a claims made policy, such reporting requirements are strictly construed." *Executive Risk Indemnity, Inc. v. Chartered Benefit Servs. Inc.,* 2005 WL 1838433, *6 (N.D.Ill. July 29, 2005) (internal quotation marks and citation omitted).

■■■ 8. Therefore, denial of coverage under a claims-made policy based on lack of notice is *not* a coverage defense. If an insurer does not receive proper notice during the period of a claims-made policy, coverage is unavailable under the policy. "If the insured does not give notice within the contractually required time period, in the instant case 'during the policy period,' there is simply no coverage under the policy." *Sigma Financial Corp. v. Ameri-*

*can Intern. Specialty Lines Ins. Co.*, 200 F.Supp. 2nd 710, 716 (E.D.Mich.2002) (quoting *City of Harrisburg v. Internat'l Surplus Lines Ins. Co.*, 596 F.Supp. 954, 961 (M.D.Pa.1984), *aff'd*, 770 F.2d 1067 (3rd Cir.1985)).

The policy at issue is a claims-made policy .... A claims-made policy is one where coverage depends on the claim being discovered and reported to the insurer during the policy period. International argues that the policy does not cover the Association's liability because the claim against the Association was not first made during that policy's effective period. The insured counters that International cannot assert this "coverage defense" because the insurer failed to comply with section 627.426(2), Florida Statutes. However, the term "coverage defense" does not include a complete lack of coverage such as in this case, where the policy term was not yet in effect when the claim was first made against the association. An insurer does not assert a "coverage defense" where there was no coverage in the first place. Although we affirm the trial court's ruling that International failed to comply with section 627.426(2), Florida Statutes, we find that the insurance company is not precluded from denying coverage because International did not assert a "coverage defense" since there was no coverage in the first place.

*Country Manors Assoc., Inc. v. Master Antenna Sys., Inc.*, 534 So.2d 1187, 1194–1195 (Fla.App.Ct.1988) (citations omitted).

9. Fla. Stat. § 627.426(2)(a) does not apply even if Florida law is applicable here. Accordingly, no conflict exists between Illinois and Florida law. Since there is no need to engage in a choice of law analysis, the court first turns to the question of whether the Ofenloch Letter was sufficient notice of circumstances to trigger coverage under the D & O policies.

### III. The Ofenloch Letter Did Not Comply With Section 7(c) of the National Union Policy and Was Not Proper Notice of Circumstances Such That Coverage Exists Under the Policies.

10. The Primary Policy, with which the Twin City and Federal policies follow form, states in Section 7(c):

If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based on or attributable to such circumstances or alleging any Related Wrongful Act to such circumstances, shall be considered made at the time such notice of such circumstances was given.

11. The purpose of this section is to provide a mechanism for alerting the insurance company that a claim may be made at some time in the future, based on some circumstances that occurred during the Policy Period. Obviously the claim would not have been made at the time the notice of circumstances letter was sent. Nevertheless, the policy requires "full particulars as to dates, persons and entities involved" in the notice of circumstances letter.

12. Coverage is triggered under claims-made policies "if the negligent or omitted act is discovered and brought to the attention of the insurer within the

policy term." *Gulf Ins. Co. v. Dolan, Fertig and Curtis,* 433 So.2d 512, 514 (Fla. 1983) (quoting 7A Appleman, Insurance Law & Practice § 4504.01 at 312 (Berdal ed.1979)). "The purpose of the reporting requirement is to define the scope of coverage by providing a certain date after which an insurer knows it is no longer liable under the policy, and for this reason such reporting requirements are strictly construed." *RTC v. Ayo,* 31 F.3d 285, 289 (5th Cir.1994).

■ 13. Claims-made policies must be distinguished from occurrence policies. Occurrence policies trigger coverage "if the error or omission occurs during the period of policy coverage, 'regardless of the date of discovery or the date the claim is made or asserted.'" *U.S. Fire Ins. Co. v. Fleekop,* 682 So.2d 620, 622 (Fla.Ct.App. 1996) (quoting *Gulf,* 433 So.2d at 514).

■ 14. For this reason, notice is crucial under a claims-made policy, and "serves a very different function than prejudice-preventing notice required under an 'occurrence' policy. If the policy requirement for notice of specified wrongful acts is relaxed, then policy coverage actually expands." *McCullough v. Fidelity & Deposit Co.,* 2 F.3d 110, 112 (5th Cir.1993). "[A]bsent policy language leading to a different result, a discovery clause should not be satisfied unless the insurer was put on notice of specifics." Allan D. Windt, Insurance Claims & Disputes: Representation of Insurance Companies & Insureds, Chapter 11: Interpretation of Important Policy Provisions, 2 Ins. Claims and Disputes 4th § 11:5 (Sept.2005) (footnotes omitted).

■ 15. Indeed, in a claims-made policy, "notice to the insurer is not simply a 'technical defense' to a claim, it defines the obligation of the insurer and the rights of the injured party." *American Safety & Risk Services, Inc. v. Legion Indemnity Co.,* 153 F.Supp. 2nd 869, 877 (E.D.La. 2001) (citation omitted).

The Fifth Circuit has interpreted such provisions as requiring the insured to give notice to the insurer of specified wrongful acts of officers and directors rather than generalized allegations of wrongdoing or other adverse information.

*National Union Fire Ins. Co. of Pittsburgh v. Willis,* 139 F.Supp. 2nd 827, 832 (S.D.Tex.2001) (citations omitted), *aff'd,* 296 F.3d 336 (5th Cir.2002). "[E]xcusing the insured from the notification provision or altering the provision is tantamount to a gratis extension of coverage to the insured." *Resolution Trust Corp. v. Artley,* 24 F.3d 1363, 1367 n. 8 (11th Cir.1994) (citations omitted).

■ 16. Having reviewed the importance of notice under a claims-made policy, the court turns to the method of notice at issue in this case. On July 23, 2001, Ofenloch, the Vice President of Finance and Treasurer of Nanovation, sent a letter to Jack Gocke, an employee of Marsh, who at the time was Nanovation's insurance broker for the purpose of placing insurance. The Ofenloch Letter states the following:

Pursuant to Section 7 of the [full title of policy] we are putting you on notice of potential claims against the Company. The Company is contemplating the filing of Chapter 11 bankruptcy petition and believe that such filing will give rise to claims being filed against the Company, its Board and Officers. We will advise you of the specifics of the claims as the Company becomes aware of them.

If you have any questions, please contact me at 734–351 0691.

17. In reading the memoranda of law submitted by the parties, the court was struck with the notion that it was as if the parties were reading two different Ofenloch Letters. The Trustee argues that the letter contained "full particulars as to the

relevant circumstances, dates, individuals and entities." Fine called it "probably the worst notice of circumstance letter that 1 ever saw, with absolutely no details." Twin City points out that not only does the letter fail "to advise the insurers of any identifiable anticipated claims, let alone particular dates, persons and entities involved," it even "admits that such specifics are not contained in the notice." How does this letter compare with other materials provided by insureds seeking to trigger coverage under a claims-made policy?

18. In *McCullough,* the policy required notification of "any act, error, or omission which may subsequently give rise to a claim being made against Directors and Officers, or any of them, for a specified Wrongful Act...". 2 F.3d at 112. The banks in *McCullough* provided their insurer with call reports that described increasing loan losses and delinquencies, as well as an annual report. The annual report referred to a cease and desist order from a regulator, but the order itself was not included. In finding that this information did not constitute sufficient notice, the *McCullough* court stated point blank that "[n]otice of an institution's worsening financial condition is not notice of an officer's or director's act, error or omission." *Id.* at 113 (citations omitted).

19. Notice of the insured's worsening financial condition was exactly the sort of notice provided by Nanovation in the Ofenloch Letter, without any of the supporting documentation provided in *McCullough.* The Ofenloch Letter told the insurers that Nanovation planned to file for bankruptcy relief—as in *McCullough,* it simply informed them of the insured's worsening financial condition. The Ofenloch Letter did not include the proposed bankruptcy schedules, the statement of financial affairs, or any other documentation, and the court is not holding that to include such documentation would have been sufficient

notice. The court is merely noting that the notice in this case was even less specific that the notice provided in *McCullough,* which the Fifth Circuit found to be insufficient.

20. In fact, there are a number of cases which hold that notice of the insured's worsening financial condition or of similar issues does not constitute notice of an officer's or director's act, error or omission under a claims-made policy. *McCullough,* 2 F.3d 110; *RTC v. Artley,* 24 F.3d at 1367–68 (policy at issue had a specific notice standard derived from the language of the policy's notice provisions). *Cf. La-Forge v. American Cas. Co. of Reading,* 37 F.3d 580, 584 (10th Cir.1994) (insured listed seven loans that had been labeled "substandard" by the FHLBB on its renewal application, which gave "no indication of what the 'occurrence' that [the insured] now hopes to rely upon might have been"); *FDIC v. Barham,* 995 F.2d 600, 605 (5th Cir.1993) (insurer's knowledge of general bad practices did not satisfy policy requirement that insurer "receive notice of the 'facts and circumstances [relating to specific wrongful acts] having the potential to give rise to a claim' "); *American Cas. Co. of Reading v. FDIC,* 944 F.2d 455, 460 (8th Cir.1991) (information insurer orally received during renewal process, that bank was expected to lose over $400,000, that the percentage of problem assets totaled almost 200% of capital, and that Comptroller of the Currency had issued a cease-and-desist order, was not effective notice of potential claims).

21. The Trustee argues that the notice was sufficient because it identified the persons and entities involved, i.e., the named insured. An insurer does not need notice that the named insured is involved, because that is a necessary condition for the policy to apply. If a claim were going to be made against someone other than the named insured, there would be no point in

providing notice of circumstances. Instead, the notice of circumstances letter must identify those persons and entities who are the potential *claimants*.

Relaxing the notice requirement, allowing coverage to be triggered by broadly phrased, innocuous, or non-specific statements, would permit an unbargained-for expansion of the policy, undermining the key distinguishing characteristic of a claims made policy—reduced exposure for the insurer and lower premiums for the insured. *Sigma*, 200 F.Supp.2d at 718 (citations omitted).

22. Do the Trustee and the Intervenor–Plaintiffs expect that the insurance companies would receive this letter, and extrapolate from it the possibility that a Chapter 11 trustee, committee of unsecured creditors, or Chapter 7 trustee might bring some future cause of action against the directors and officers? Since the letter provides absolutely no specifics about any actions taken by those directors and officers, in what sort of conjecture do the Trustee and Intervenor–Plaintiffs expect the insurance companies to engage?

23. Having reviewed Section 7(c) of the policy as well as the exact language of the Ofenloch Letter, the court is left with the definite and firm conviction that the letter did not constitute sufficient notice of circumstances to trigger coverage under the policies.

*IV. The Insurers' Responses to the Ofenloch Letter*

*A. National Union responded to the Ofenloch letter in a reasonable amount of time, and did not waive its right to object to notice. Federal and Twin City had no duty to defend and therefore no duty to respond until coverage was triggered.*

24. "Generally, good faith requires that an insurer notify an insured of deficiencies in notice within a reasonable time period." *Brown Daltas and Associates, Inc. v. General Accident Ins. Co. of America,* 844 F.Supp. 58, 67 (D.Mass. 1994), *rev'd on other grounds,* 48 F.3d 30 (1st Cir.), *cert. denied,* 516 U.S. 822, 116 S.Ct. 83, 133 L.Ed.2d 41 (1995). "Insurers have a duty to respond to correspondence and queries from their insureds in a reasonably timely manner." *Moore v. First Security Casualty Company,* 224 Mich. App. 370, 568 N.W.2d 841, 845 (1997).

25. Ofenloch sent his letter to Dennis Love at Marsh on July 23, 2001, two and a half months before the policies were set to expire on October 8. Love sent letters dated July 25, 2001, along with a copy of the Ofenloch Letter, to National Union, Chubb (on behalf of Federal) and The Hartford (on behalf of Twin City). National Union and Federal received the Ofenloch Letter before the end of July. On August 10, 2001, Nancy Pease from Chubb wrote Ofenloch acknowledging receipt of his letter and advising him that "[a]s Federal's policy is follow-form to the Primary Policy and National Union has not yet issued its coverage opinion, we are unable to advise of our coverage position at this time."

26. On August 17, 2001, Larry Fine of AIG wrote to Love acknowledging receipt of his letter and advising that Sylvia Toyos was the claims director assigned to handle the matter who would issue a coverage opinion addressed to him "[i]n the near future." The letter also advised Love to consider providing notice to other insurance carriers, if coverage might be available. The letter did not promise a response within a specific time, nor did it state that a claim file had been opened.

27. Nanovation heard nothing further from National Union during August or

September 2001. Toyos wrote to Love on October 29, 2001, stating that the Ofenloch Letter "does not set forth the circumstances or reasons for anticipating such a Claim nor does it provide full particulars as to dates, persons and entities involved."

28. The Trustee and Intervenor–Plaintiffs argue that because of the amount of time National Union took to find the Ofenloch Letter to be insufficient notice, it waived any challenge it might have to the adequacy of that notice. In support of this argument, they cite three cases which rely on the holding of a fourth, *Federal Savings and Loan Ins. Corp. v. Burdette*, 718 F.Supp. 649 (E.D.Tenn.1989). *Burdette* held that "[i]f notice provided to an insurer is considered by the insurer to be defective, good faith requires the insurer to notify the insured of its objections within a reasonable time, and if the insurer fails to do so or proceeds to act as though notice was satisfactory, it has waived any right to assert notice as a defense at a later date." *Id.* at 653.

29. The facts in *Burdette*, however, were so different from those in the instant case that the court cannot allow this holding to be taken out of context.

30. In *Burdette*, after the insurance company received notice of circumstances, it responded by acknowledging receipt of the letter and indicating that until an action was commenced against an insured, the insurer would take no affirmative action. "The response also added that a claim file had been opened, and that ACC [the insurer] wished to be advised of all developments relating to the matter." *Id.* at 652. About five weeks later, one of the insureds wrote a letter also providing notice of circumstances, and the insurer responded by stating "that if nothing more was heard within sixty days, it would be assumed that no claims were filed, and ACC would close its files." *Id.*

31. These letters were far more detailed than the brief correspondence sent by Fine on August 17, and could certainly have led to the conclusion that

there is an absence of any attempt by ACC to inform Alexander or Stair [authors of the two letters] that their letters were not considered proper notice under the policy, or that additional information would be necessary in order for proper notice to be given. Indeed, the responses ACC provided indicated that ACC thought notice was proper, as claim files were opened and ACC stated that it would await the commencement of formal litigation against the officers and directors before it would take any further action.

*Id.* at 654. By contrast, Love received a brief form letter from Fine merely advising that the letter had been received and assigned to Toyos. National Union did not give any indication that it thought notice was proper.

32. The *Burdette* court scolded the insurer for remaining "silent at the time purported notice is received, and then much later, after claims have been filed which may subject the insurer to some liability under the policy ... complain for the first time that notice was not sufficient." *Id.* at 654. Unlike the insurer in *Burdette*, National Union did not wait until after claims were filed to suddenly complain about notice. About two months after Fine's form letter, the first substantive response Nanovation received informed it that the notice of circumstances was insufficient. There were no intervening letters that could have clouded the issue or lulled Nanovation into believing that notice was sufficient.

33. Additionally, the *Burdette* court criticized the insurer for not attempting "to obtain any more specific information

relating to the identification of the officers and directors to be sued." *Id.* at 653. There is no such requirement in the Primary Policy that National Union attempt to obtain additional information, and in fact Ofenloch had promised to advise National Union "of the specifics of the claims as the Company becomes aware of them."

34. Not only are the facts in *Burdette* crucially different than those before the court today, the precedential basis for *Burdette's* holding is totally inapplicable as well. In support of its holding that an insurer waives any right to assert notice as a defense if it fails to notify the insured of its objections within a reasonable time, *Burdette* cites three Supreme Court of Tennessee cases. The oldest is *Johnson v. Scottish Union Ins. Co.*, 160 Tenn. 152, 22 S.W.2d 362 (1929). After Johnson's house burned down, at least two lists of personal property were furnished to his insurance agent, who passed them on to the adjuster. The insurer made no complaint about the lists at the time of receipt. Yet when requests were made for settlement, "the insured and his counsel were broadly told to perfect their claim." *Id.* at 363.

35. The *Johnson* court found that

[I]f the insured attempts to comply with the requirements of a policy as to notice and proofs of loss, the receipt and retention of such a notice of proof of loss by the insurer without objection constitutes a waiver of its right to object thereto as not satisfying the requirements of the policy. Good faith on the part of the insurer requires that it point out the details in which a notice or proof of loss is insufficient under the contract and give the insured an opportunity to correct these defects. Good faith does not permit an insurer to be silent and evasive under such circumstances.

*Id.* at 363 (citations omitted). *Burdette* also relied on *Pennsylvania Ins. Co. v.*

*Horner*, 198 Tenn. 445, 281 S.W.2d 44 (1955), which involved an individual insured who gave no notice at all and therefore breached his automobile insurance policy, and *Crumley v. Travelers Indemnity Co.*, 225 Tenn. 667, 475 S.W.2d 654, 658 (1972), in which the automobile insurance company was held to have waived any notice defense after employing the insured's attorney "to prosecute its own subrogation claim, necessarily in conjunction with [the insured's] action."

36. So while *Burdette* itself involved a claims-made policy covering directors and officers, the case law on which it based the holding that failure to object to notice constitutes waiver of an insurer's right to object dealt with notice under personal property and automobile policies for individuals. These policies were occurrence policies. This is an extremely important distinction to make, because as the court discussed above, notice is so very crucial under *claims-made* policies. It "serves a very different function than prejudice-preventing notice required under an 'occurrence' policy. If the policy requirement for notice of specified wrongful acts is relaxed, then policy coverage actually expands." *McCullough*, 2 F.3d at 112.

37. As a result, not only were the facts in *Burdette* much different than those before the court today, but the case law which led to the holding that an insurer may waive the right to argue defective notice involved personal property, occurrence policies. *Burdette*, its holding, and the later cases that relied upon it are distinguishable. *See FDIC v. Interdonato*, 988 F.Supp. 1, 10 (D.D.C.1997) (two letters from insurer stating that the D & O policy was not implicated because no lawsuit had been filed "implied that [the insured] did not need to provide any additional notice relating to director liability until a claim had been filed against them"); *Fleekop,*

682 So.2d at 628 (insurer waited ten months "and after the subject lawsuits had been filed" to object to notice); *Slaughter v. American Casualty Co.*, 842 F.Supp. 376, 379 (E.D.Ark.1993) (the insurer "never informed [the insured] that its notice was insufficient"), *rev'd on other grounds*, 37 F.3d 385 (8th Cir.1994).

38. For all of these reasons, the court finds that National Union's response was given within a reasonable period of time, and that National Union did not waive its right to assert defective notice.

■ 39. As for Federal, all of the parties seeking coverage have stipulated that on Federal's behalf Pease wrote to Ofenloch on August 10, stating, *inter alia:*

> As Federal's Policy is follow-form to the Primary Policy and National Union has not yet issued its coverage opinion, we are unable to advise of our coverage position at this time. Please provide the undersigned with the coverage position issued by the [sic] National Union. Once we receive and review their position, Federal will analyze with respect to this matter. In the interim, Federal must reserve all rights under the Excess Policy and Primary Policy, and those available at law to take any and all reservation of rights, deny coverage and/or rescind the Excess Policy based on any and all terms, conditions, exclusions, endorsements and provisions of the Excess Policy and Primary Policy, including representations, statements, declarations and omissions in the applications therefor.

Although Ofenloch does not recall receiving that letter, the parties have stipulated that it was sent. Chaney admitted that Nanovation received a response from Federal, and that he directed Ofenloch to stay in contact with Lew Rosenbloom regarding the response. Moreover, Love was carbon copied on the letter, and he acknowledged that he received it. Federal responded timely to the Ofenloch Letter and reserved all of its rights to decline coverage.

40. The Trustee asserts that Federal's argument—that as an excess carrier it had no duty to timely respond to Nanovation's notice of circumstances until National Union responded—was rejected by the court in *Cassara v. Nationwide Mut. Ins. Co.*, 144 A.D.2d 974, 534 N.Y.S.2d 277, 277–278 (N.Y.App.Div.1988). The *Cassara* court did reject this argument, but that was because the disclaimer given by the excess carrier was not given "as soon as is reasonably possible," as required by N.Y. Ins. Law § 3420[d] (2006).

41. However, section 3420(d) applies to "coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state...". It has nothing to do with liability under a directors and officers policy. Moreover, that law only applies within the State of New York. *See* Judith F. Goodman and Sue C. Jacobs, Reservation of Rights, Waiver and Estoppel, 1 Law and Prac. Of Ins. Coverage Litig. § 8.11 (2005) ("Absent either a statute or case law setting forth precise guidelines, the timeliness of a reservation of rights letter is a question of fact, decided case by case."). And in fact, Federal did send its reservation of rights letter promptly, approximately 2 weeks after Love forwarded the Ofenloch Letter.

■ 42. "Primary insurance is coverage whereby liability attaches immediately upon the happening of the occurrence that gives rise to liability. Excess or secondary coverage, on the other hand, provides coverage whereby liability attaches only after a pre-determined amount of primary coverage has been exhausted." *Northbrook Property & Cas. Ins. Co. v. U.S. Fidelity & Guar. Co.*, 150 Ill.App.3d

479, 103 Ill.Dec. 500, 501 N.E.2d 817, 819 (1986). Since "[i]t is the duty to defend which gives rise to the duty to reserve rights when defense of a claim is undertaken," an insurer who does not have such a duty—such as an excess carrier where the primary coverage has not yet been exhausted—is not required to issue a reservation of rights letter. *International Ins. Co. v. Sargent & Lundy,* 242 Ill.App.3d 614, 182 Ill.Dec. 308, 609 N.E.2d 842, 855 (1993).

■ 43. As the second excess carrier, Twin City's duty to defend had not yet been triggered. In any event, while Twin City did not issue its own reservation of rights letter, Federal was the first excess carrier and did so promptly.

44. Moreover, Twin City's file on Nanovation was destroyed in the events of September 11th. After reconstructing its file, Twin City promptly contacted Marsh to obtain a copy of the Ofenloch Letter. Twin City informed Nanovation of its coverage position by letter dated February 12, 2002, by which time Nanovation had already learned that National Union had found the Ofenloch Letter insufficient. As Federal pointed out in its reservation of rights letter, the excess policies were follow-form. What was insufficient for the National Union policy would be insufficient for the excess policies. Any delay in Twin City's response did not indicate a lack of good faith, given its status as an excess carrier whose duty to defend had not been triggered, and the actions of the first ex-

cess carrier, Federal, which had already issued a reservation of rights letter.

*B. National Union is not estopped from denying the adequacy of the notice for the D & O policy even though AIGTS accepted the Ofenloch Letter as notice of circumstances under the ProTech Policy.*

■ 45. An insurer is estopped from denying coverage when three elements are met: (1) the insured was misled by an act or statement of the insurer; (2) the insured reasonably relied on the insurer's conduct or representation; and (3) the insured was prejudiced as a result. *See Conagra, Inc. v. Arkwright Mut. Ins. Co.,* 64 F.Supp. 2nd 754, 765 (N.D.Ill.1999) (citations omitted).[2] "The insured has the burden of establishing estoppel by 'clear, concise, and unequivocal evidence.'" *Id.* (citation omitted).

■ 46. On October 29, 2001, Toyos, on behalf of AIG, advised Nanovation that the Ofenloch Letter did not constitute notice in accordance with clause 7(c) of the National Union Primary Policy. The Trustee and the Intervenor–Plaintiffs assert that because of the delay in responding to the Ofenloch Letter, and especially after AIGTS acknowledged the identical notice under the ProTech Policy, Nanovation believed that its notice was sufficient. Therefore, they argue that the insurers are estopped from denying the adequacy of the notice of circumstances.

47. The insurers note that the Trustee is relying on a statement in Ofenloch's

---

**2.** The doctrine of estoppel does not apply under Florida law, but the court has completed the analysis under Illinois law, *See Doe v. Allstate Ins. Co.,* 653 So.2d 371, 373 (Fla. 1995) ("For many years the law in Florida has been 'well established that the doctrine of waiver and estoppel based upon the conduct or the action of the insurer (or an agent) is *not* applicable to matters of *coverage*

as distinguished from grounds for *forfeiture.*'") (citations omitted) (emphasis in original) (Distinguishing the situation where an insurer erroneously begins to undertake the defense of a claim and that assumption of the defense has prejudiced the insured.). Since the court concludes that estoppel does not apply under Illinois law either, there is no conflict.

affidavit which states that he received the August 28, 2001 letter from Thornton, which acknowledged receipt of Ofenloch's notice of circumstances. This statement is inconsistent with Ofenloch's earlier deposition testimony on March 9, 2004, in which he stated that he did not recall receiving any correspondence or phone calls from any insurance carriers regarding his July 23, 2001, letter, and the insurers ask the court to disregard the affidavit. However, the court has already denied National Union's motion to strike this portion of Ofenloch's affidavit. (Adv. No. 02–1680, docket # 283.)

48. National Union admitted in its answer that Thornton wrote Ofenloch a letter dated August 28, 2001. (NU Answer, ¶¶ 48 and 49.) Since National Union admitted that Thornton sent the letter, there is no material dispute over that fact. However, there is a yawning gap between the admission that Thornton sent the letter and a court finding that Nanovation was misled by the letter and reasonably relied on AIGTS' conduct. There is no evidence whatsoever to suggest that Nanovation relied on Thornton's letter to reassure itself that the Ofenloch Letter was sufficient notice of circumstances under the D & O policy. The ProTech Policy was a totally different policy issued by a separate division of AIG. It insured a different type of risk from the D & O policy.

49. The Trustee and the Intervenor–Plaintiffs cannot logically argue that an act by AIGTS with regard to the ProTech Policy misled Nanovation as to whether National Union would accept the notice of circumstances for the D & O policy. And in fact, there is no evidence that anyone at Nanovation actually *did* rely on the Thornton letter as an acceptance of the Ofenloch Letter regarding the D & O policy. The Trustee and Intervenor–Plaintiffs would have to show by "clear, concise and un-

equivocal evidence" that no material issue of fact exists regarding whether Nanovation was misled by the acceptance and reasonably relied on it. No such showing has been made. As a result, National Union is not estopped from denying the adequacy of the notice of circumstances.

*C. Neither National Union, nor Federal, nor Twin City acted in had faith with respect to their responses to the Ofenloch Letter.*

50. The parties agree that under Florida law, an insurer acts in bad faith when, taking all circumstances into consideration, it failed to act "fairly and honestly toward its insured and with due regard for her or his interests." Fla. Stat. § 624.155(b)(1). Although this subsection refers only to a situation where an insurer is not attempting in good faith to settle claims, the insurers have not contested this definition of bad faith, first set forth by the Trustee.

51. The Trustee then acknowledges that some courts interpreting bad faith claims have described bad faith as "deliberate deception, gross negligence or recklessness." *American Bankers Ins. Co. of Florida v. Northwestern National Ins. Co.*, 198 F.3d 1332, 1336 (11th Cir.1999). *American Bankers* reached this conclusion in the context of considering whether a ceding insurer acted in good faith in settling or paying claims. Because a simple negligence standard "would vitiate all of the policy reasons that give rise to the follow the fortunes doctrine" in a reinsurance case, *American Bankers* determined that far more than simple negligence had to be shown. *Id.*

52. Despite this acknowledgment, the Trustee asks the court to consider the description of bad faith found in *Volusia Memorial Park v. White*, 549 So.2d 1114, 1117 (Fla.Ct.App.1989) (emphasis added):

Although the statutory language sounds like the standard for punitive damages at common law, it has been construed to impose a less stringent standard, and encompasses a carrier's *passive delay* or denial of payment of benefits without a showing of active effort and initiative by the carrier to place the benefits due in the hands of claimant.

However, *Volusia* was interpreting a *worker's compensation statute* which allowed fees when there was a finding that the "carrier has acted in bad faith with regard to handling an injured worker's claim and the injured worker has suffered economic loss." Fla. Stat. § 440.34(b) (1985). Not only does *Volusia* concern a completely different subject matter, but the subsection under which bad faith was found in that case was repealed in 1989.

■ 53. In any event, the court will follow the "totality of the circumstances" test set forth in *State Farm Mutual Ins. Co. v. Laforet*, 658 So.2d 55, 62–63 (Fla. 1995), and cited by National Union in its response and the Trustee in his reply.

54. Under the totality of the circumstances approach, the Supreme Court of Florida agreed with one of its lower courts and found

> that at least five factors should be taken into account: (1) whether the insurer was able to obtain a reservation of the right to deny coverage if a defense were provided; (2) efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to the insureds; (3) the substance of the coverage dispute or the weight of legal authority on the coverage issue; (4) the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage; and (5) efforts made by the insurer to settle the liability claim in the face of the coverage dispute.

*State Farm*, 658 So.2d at 62–63 (citation omitted).

■ 55. National Union assumes that the Trustee has argued bad faith based on two actions: First, by responding to the Ofenloch Letter after the two excess policies had expired, and second, by sending its coverage position letter to Marsh. The Trustee addressed the first set of circumstances in his reply, but not the second. The court has not considered whether sending the letter to Marsh constituted bad faith; Marsh was Nanovation's agent for the purpose of this policy and the Trustee has not argued otherwise in his reply. Moreover, since Marsh forwarded the Ofenloch Letter to National Union, it seems perfectly reasonable for National Union to address its reply to Marsh.

56. With regard to National Union's response to the Ofenloch Letter, however, based on the factors described in *State Farm*, the court finds that National Union was neither deliberately deceptive, nor grossly negligent, nor reckless.

57. While the first factor set forth in *State Farm* is not relevant here, the second factor concerns efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to the insured. A dispute about notice was a dispute about coverage. Since the court has found that National Union's response to Nanovation was accomplished within a reasonable period of time, it would be inconsistent to conclude here that National Union's actions were deliberately deceptive or grossly negligent.

58. Moreover, National Union responded to Nanovation more than five months before the Primary Policy expired, yet neither Nanovation nor Marsh did anything further to supply particulars or provide additional details. The facts of this case

are simply that no claim was made until after the Primary Policy expired.

59. National Union points out that it was not a party to the two excess policies and had no obligation to respond before those contracts expired. None of the uncontested facts demonstrated that Toyos or Fine was aware of the excess policies or knew when they would expire. In fact, Fine's letter advised Love that if "other insurance might provide coverage for this matter, you may want to consider providing notice to other insurance carriers." There was no reference in the letter to particular policies issued by particular insurers. Indeed, even after National Union responded Nanovation did *nothing* to supplement the notice of circumstances. There was no showing that if Nanovation had learned that the Ofenloch Letter was insufficient before the excess policies expired that it would have—or could have—done anything to cure the problem.

60. It is an undisputed fact that there were no specific rules, guidelines or policies given at AIGTS regarding a time frame for responding to a notice of circumstances. Toyos testified at her deposition that she generally attempted to respond within a month. Fine testified that his typical response time to a notice of circumstances varied from a day to a few months.

61. Less than 4 weeks after Fine wrote to Love acknowledging receipt of the Ofenloch Letter, the tragic events of September 11th occurred. While National Union and Toyos were not affected in the same manner as Twin City, whose entire file was destroyed, these events did have an impact. After September 11th, AIGTS was closed for a week, and then there was a necessary catch-up period. Based on all of these facts and circumstances described above, the Trustee has not demonstrated a lack of diligence and thoroughness on National Union's part. .

62. The time National Union took to respond to the Ofenloch Letter was neither vexatious nor unreasonable, which is the standard for recovery under the applicable Illinois statute. Under Illinois law, pursuant to the most recent decision of the Supreme Court of Illinois, there is no separate tort of bad faith which can be brought against an insurer. *Cramer v. Ins. Exchange Agency,* 174 Ill.2d 513, 221 Ill.Dec. 473, 675 N.E.2d 897 (1996). Rather,

> an insurer's conduct may give rise to both a breach of contract action and a separate and independent tort action. Mere allegations of bad faith or unreasonable and vexatious conduct, without more, however, do not constitute such a tort. Courts therefore should look beyond the legal theory asserted to the conduct forming the basis for the claim. In cases where a plaintiff actually alleges and proves the elements of a separate tort, a plaintiff may bring an independent tort action, such as common law fraud, for insurer misconduct.

*Id.* at 904 (citations omitted). The court reviewed the conduct complained of, and does not find the elements of a separate tort. Therefore, the Trustee's allegations limit him to recovery under 215 ILCS § 5/155:

> (1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $60,000;

(c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

215 ILCS 5/155 (West 2006) (emphasis added).

63. For the same reasons that the court found that National Union's actions did not rise to the level of deliberate deceptiveness, gross negligence or recklessness, so too these actions are not vexatious and unreasonable.

64. For all of these reasons, the court finds that National Union did not act in bad faith under Florida common law, and did not engage in vexatious and unreasonable delay under the applicable Illinois statute. As stated above in the section on good faith, Federal and Twin City are excess carriers whose duty to defend had not been triggered. It appears from the briefing that the Trustee is not pursuing his bad faith action against Federal and Twin City, and the court would not have found for the Trustee against the excess carriers on this issue in any event.

### CONCLUSION

For all of the reasons stated above, the motions for summary judgment brought by National Union, Federal and Twin City are granted, and those brought by the Trustee, by the Intervenor–Plaintiffs and by James Davidson are denied. The Ofenloch Letter was not sufficient notice of circumstances, and National Union did not waive its right to object to that notice. National Union is not estopped from denying the adequacy of the notice. Furthermore, National Union did not act in bad faith. Lack of good faith, waiver, estoppel and bad faith are not applicable to Federal or Twin City.